UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


JOHN ANTHONY SPENCER,                    CIVIL NO. 13-177 (JNE/JSM)

      Plaintiff,

v.                                       <u>REPORT AND RECOMMENDATION</u>

FEDERAL PRISON CAMP DULUTH, MN;
WARDEN, FEDERAL PRISON CAMP DULUTH, MN;
CORRECTIONS OFFICER ANDERSON;
CORRECTIONS OFFICER BAKER;
CORRECTIONS OFFICER GRABDDL;
CORRECTIONS OFFICER BRIAN H;
UNKNOWN CORRECTIONS OFFICER WITH
CORRECTIONS OFFICER BAKER ON 12-19-12; and
MAIL ROOM STAFF OF DECEMBER 12, 2012;

      Defendants.


The above matter came before the undersigned on Defendants' Motion for Summary Judgment [Docket No. 140]; Plaintiff's Motion for Leave to Amend [Docket No. 154]; Plaintiff's Response and Cross-Motion for Summary Judgment [Docket Nos. 155, 155-1];[1] and Plaintiff's Motion for Sanctions [Docket No. 163]. These motions were referred to the undersigned United States Magistrate Judge for a Report and

---

[1]     Although styled as a response and cross-motion for summary judgment, pages 7-42 of the 64 pages of this pleading consist of 111 numbered paragraphs, most of which begin with the phrase "The evidence will show." As this section of the response, entitled "Disputed Facts and Evidence Overview," ("Pl.'s Facts and Evid.") was verified under penalty of perjury, the Court will treat it as plaintiff's evidentiary submission in support of his legal arguments. <u>See</u> Fed. R. Civ. P. 56(c)(1) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); 28 U.S.C. § 1746 (allowing a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit).

Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(B) and Local Rule 72.1(c).

## I.    BACKGROUND

### A.    <u>Background</u>

Plaintiff is a federal inmate in the custody of the United States Bureau of Prisons ("BOP").  Declaration of David Baker ("Baker Decl."), ¶¶ 3, 4 [Docket No. 144].  From November 8, 2011 to February 21, 2013, plaintiff was incarcerated at the Federal Prison Camp in Duluth, Minnesota ("FPC-Duluth").  Plaintiff is currently incarcerated at the Federal Correctional Institution in Sandstone, Minnesota ("FCI-Sandstone").

Plaintiff was convicted of mortgage fraud, bank fraud, and conspiracy to commit mortgage and bank fraud following a jury trial.  <u>United States v. Spencer</u>, 10-cr-326 (DSD/FLN), Docket No. 91 (jury verdict).  Plaintiff was sentenced to 125 months[2] imprisonment within the BOP's custody.  Baker Decl., ¶ 3; Ex. A.  The Eighth Circuit affirmed plaintiff's conviction and sentence.  <u>United States v. Spencer</u>, 700 F.3d 317, 324 (8th Cir. 2012).  Plaintiff applied for rehearing <u>en banc</u>, which was denied on December 13, 2012.  <u>Id.</u>  Plaintiff's deadline to petition for a writ of certiorari to the United States Supreme Court expired 90 days later, on or about March 13, 2013.  Pursuant to S. Ct. R. 13(5), plaintiff had until March 3, 2013, to apply for a 60-day extension of time to file his petition for a writ of certiorari.  Plaintiff did not apply for an extension, nor did he file a petition for a writ of certiorari.

---

[2]    The Government erroneously stated that plaintiff was sentenced to 125 years in prison.  Defendants' Memorandum in Support of Motion for Summary Judgment ("Defs.' Mem."), p. 2 [Docket No. 142].

On December 17, 2013, plaintiff filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2255, alleging prosecutorial misconduct during his trial, Brady violations, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel. United States v. Spencer, Civ. No. 10-326(1), 2014 WL 3573600, at *1 (D. Minn. July 21, 2014). The District Court denied the petition and denied a certificate of appealability. Id. at *13. On February 11, 2015, the Eighth Circuit denied plaintiff's application for a certificate of appealability and dismissed his appeal. Declaration of Bahram Samie ("Samie Decl."), Ex. 6 (Eighth Circuit Court of Appeals Judgment) [Docket No. 151-6]. Plaintiff filed a petition for writ of certiorari to the United States Supreme Court regarding his habeas petition. The petition was summarily denied. See Spencer v. United States, 136 S. Ct. 1391 (2016).

Plaintiff remains in BOP custody and has a projected release date of June 27, 2020. Baker Decl., ¶ 4, Ex. B.

### B.   Amended Complaint[3] and Supplement to Amended Complaint

Plaintiff sued "Warden FPC-Duluth," Corrections Officers Jon Anderson, David Baker, Daniel Gravdal,[4] Brian Henrickson, "Unknown CO with CO Baker on 12-19-12," and "Mail Room Staff of Dec. 12, 2012, FPC Duluth et. al."[5] in their personal capacities under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), alleging that defendants conspired to violate his constitutional rights to due process, access to the

---

[3]   The Amended Complaint was certified by plaintiff under penalty of perjury. Amended Complaint, p. 12.

[4]   Gravdal is listed in the caption as "Grabddl."

[5]   Although the Amended Complaint used the phrase "et. al." there were no other defendants named.

courts, and freedom from retaliation for exercising his right of access to the courts. Amended Complaint [Docket No. 26].

The Amended Complaint alleged as follows.   On December 12, 2012, plaintiff was called to the mail room at FPC-Duluth and was served with a subpoena for a deposition in a civil case.   Amended Complaint, ¶¶ 1-21.   The process server told plaintiff and "BOP staff" that pursuant to Minn. Stat. § 357.22, he was required to deliver to plaintiff a check in the amount of $20.00 as the "<u>requisite</u> witness fee."   Id., ¶ 7 (emphasis in original).   There was some uncertainty as to whether plaintiff could accept the $20 witness fee, but nonetheless, plaintiff was "ordered" by BOP staff to accept service of the subpoena. Id., ¶¶ 9, 10.   Plaintiff alleged that he told the process server and BOP staff that "without the requisite witness fees, and requisite compensation for time and expenses," he would not participate in a telephonic deposition. Id., ¶ 11.   The process server told BOP staff that the fee was required as a necessary part of the subpoena. Id.   Plaintiff was instructed by the BOP mail room staff that the issue of the check (i.e. whether plaintiff could keep the check) would have to be resolved and plaintiff should look for further instructions from his prison counselor, defendant Jon Anderson.[6]   Id., ¶ 14.   Before leaving the mail room, plaintiff told staff that he did not know how the issue of the check would be resolved, but that under no circumstances would he participate in the deposition without the $20 witness fee. Id., ¶ 15.

Later that day, Anderson told plaintiff that he would be participating in the deposition on December 17, 2012, at "about" 8:00 a.m.; Anderson would call plaintiff to

---

[6]   Anderson is a Correctional Counselor at the FPC-Duluth.   Declaration of Jon Anderson ("Anderson Decl."), ¶ 1 [Docket No. 143].

his office at that time; and he would, "if he didn't forget," place plaintiff on the callout[7] list. Id., ¶ 17.  Plaintiff objected, stating that he would not participate in the deposition without obtaining the advice or assistance of counsel; without the witness fee, it would be impossible for him to contact an attorney, the attorneys who sought the deposition or the court because he was indigent; and because it appeared that the attorneys who issued the subpoena wanted to inquire on issues touching on his criminal case, he would not participate and would likely invoke Fifth Amendment rights.  Id., ¶ 18. Anderson instructed plaintiff to contact the mail room staff regarding the witness fee check.  Id., ¶ 19.  That evening, plaintiff received a BOP notice of "Material Rejected and Returned," citing the prohibited "negotiable instrument" (i.e. the witness fee check). Id., ¶ 21.  According to plaintiff, returning the check constituted failure of service.  Id.

On December 14, 2012, plaintiff wrote a "cop-out" (an inmate request form)[8] to "Warden or Admin." stating that forcing him to participate in the deposition without the witness fee violated his due process rights and his right to counsel.  Id., ¶ 22.  The same day, plaintiff wrote a second cop-out to "Baker[9] or Admin," stating that he was indigent and could not buy a stamp to mail a letter to or call the attorney who served him with the subpoena to inform him he would not participate in the deposition.  Id.  Plaintiff

---

[7]     An inmate is placed on a "callout" list so that prison staff has a record of where the inmate is located if he is scheduled to be somewhere other than his daily assigned location.  Anderson Decl., ¶ 13.

[8]     This cop-out did not actually make any request, but defendants have also referred to this statement as a cop-out, and therefore the Court treated it as such.  See Defs.' Mem., p. 18.

[9]     Defendant David Baker was a Unit Manager at the FPC-Duluth during this time period.  Baker Decl., ¶ 1.

asked for a stamp or phone call to call the lawyer who issued the subpoena to tell him that he had been denied the witness fee.  Id.  Plaintiff did not receive a response to either cop-out.  Id., ¶ 23.

Plaintiff alleged that he went to Anderson's office at 6:45 a.m. on December 17, 2012, but Anderson was not there.  Id., ¶ 24.  Plaintiff then went to his assigned work area at the recreation center.  Id., ¶ 25.  He did not hear himself being paged before the announcement of "A.M. Census Clear."[10]  Id.  Just after the census was cleared, plaintiff responded to the page to report to Anderson's office.  Id., ¶ 26.  Plaintiff went to Anderson's office, at which time Anderson reprimanded him for not appearing earlier and asked plaintiff where he had been.  Id., ¶¶ 27, 28.  Plaintiff told Anderson that he had been in his assigned work area in the recreation department.  Id., ¶ 28.  Anderson then ordered plaintiff to pick up the telephone and "do as instructed from the other end of the line," without asking plaintiff about his concerns or intentions about participating in the deposition.  Id., ¶ 29.  Plaintiff alleged that in response to Anderson's intimidation, he became silent during the attempted deposition, which angered Anderson.  Id., ¶¶ 30-38.  In response to his silence, the attorneys told plaintiff that they would "get Mr. Anderson back on the line," apparently to complain about plaintiff's silence.  Id., ¶ 31.  Anderson talked to the attorneys and then again ordered plaintiff to take the phone and participate in the deposition.  Id., ¶ 32.  Anderson continued to try to intimidate and coerce plaintiff into signing some documents that plaintiff had never seen before.  Id., ¶ 34.  Anderson told plaintiff he could not read the documents until he signed them.  Id.  This resulted in an argument between Anderson and plaintiff, in which

---

[10]     According to Anderson, census checks are a way for the staff to identify if an inmate is in an unauthorized or unassigned area of the facility.  Anderson Decl., ¶ 16.

Anderson told plaintiff that it was in plaintiff's best interests to do what he was told, "as this was a 'direct order to sign the paperwork.'" Id., ¶ 35. Plaintiff refused to sign the documents, requested counsel, and indicated he would not continue with "this forced deposition." Id., ¶ 36. Anderson gathered up the documents placed before plaintiff and chastised him for not participating in the deposition, stating: "You are going to get a shot for this. "[Y]ou made me look bad and wasted my time and there's no getting away with that. I have some sympathy, but not for people like you." Id., ¶ 38.

At about 7:00 p.m. that evening, plaintiff was called to the "Lieutenant's" office and was given "an institutional 'shot'" for purportedly being late to a callout.[11] Id., ¶ 40. The next day, December 18, 2012, plaintiff alleged that as punishment, he was re-assigned to kitchen duty from his previous job in the recreation department. Id., ¶ 41. That afternoon, plaintiff approached Anderson and asked him about the job change. Id., ¶ 42. Anderson said that he changed plaintiff's job assignment in retaliation for plaintiff not participating in the deposition and admitted that plaintiff had submitted cop-out expressing his intention to not participate in the deposition, but that the cop-outs "made no difference." Id., ¶ 42. Plaintiff told Anderson that he would submit a grievance and Anderson told him to "go ahead," he (Anderson) hands out one hundred BP-8s (a cop-out form) every week and "nothing happens." Id., ¶ 44. Further, plaintiff could file a BP-9 (appeal form) with Baker, but "it's not going to matter." Id.

On December 19, 2012, plaintiff was paged to Baker's office for a disciplinary hearing before Baker and an unidentified officer, at which time Baker read from the

---

[11]     On December 17, 2012, at 6:45 p.m., Anderson wrote an incident report regarding plaintiff's late appearance after being paged. Anderson Decl., ¶ 12, Ex. B (incident report).

incident report. Id., ¶¶ 45, 46. Baker "verbalized a narrative that he (Baker) wanted [plaintiff] to accept as true" regarding the events of December 17, 2012. Id. Plaintiff was not asked any "real questions" and according to plaintiff, Baker's real purpose was to threaten plaintiff with harsher punishment and the loss of more privileges if he did not agree to Baker's narrative. Id., ¶¶ 47, 48. Plaintiff claimed he was not allowed to develop his side of the case and the unidentified officer stood over plaintiff and said "I've worked here 20 years and I know when an inmate is lying, and your [sic] lying!" Id., ¶¶ 49, 50. Baker told plaintiff that because of his "admission of guilt" (which plaintiff denied), he affirmed the shot, imposed a 30-day suspension of his commissary rights, phone and visiting privileges, ordered plaintiff to "stop doing legal work," and told plaintiff that "compound lawyers. [sic] don't [sic] make it here." Id., ¶ 51. Plaintiff claimed that this caused him tremendous fear, as he was helping a friend with a habeas corpus filing and was working on his own appeal. Id., ¶ 52.

On December 22, 2012, plaintiff was called to "the Lieutenant's" office and asked whether he was doing legal work for other inmates. Id., ¶ 54. Plaintiff was placed "in the hole."[12] Id. According to defendants, plaintiff was transferred to the SHU on December 23, 2012. Baker Decl., ¶ 28. On January 18, 2013, plaintiff was transferred to Douglas County Jail. Id. He was returned to FPC-Duluth on February 20, 2013, and on February 21, 2013, he was transferred to FCI-Sandstone. Id., ¶¶ 28, 34.

Plaintiff alleged that between December 26, 2012 and March 1, 2013, his "institutional grievances were systematically ignored." Id. ¶ 55. Specifically, plaintiff claimed that the following requests were ignored: on December 26, 2012, he requested

---

[12]     The Court assumed plaintiff was referring to the Special Housing Unit ("SHU").

legal work product and "indigent supplies;" on December 27, 2012, he asked for postage for the courts; on January 2, 2013, when he asked for a BP-10 form (appeal to the BOP Regional Office), he was asked to first describe the reason why he wanted the form, which defeated the purpose of the form, and he was denied the form; on January 3, 2013, plaintiff asked for "indigent supplies" for "court access," asked to review his Presentence Investigation Report ("PSI"), and asked for access to "legal work product" in connection with his appeal to the Supreme Court; on January 5, 2013, plaintiff again asked for a BP-10 form, at which time he was brought out of his cell and "intimidated out of filing any grievances;" on January 7, 2013, plaintiff was given a written statement by Anderson about why he was denied "indigent supplies," but he could not read it.  Id. Plaintiff asked for clarification as to why Anderson decided he did not qualify to have his own legal work product, stamps that were his own property or indigent supplies, but Anderson never responded; on January 8, 2013, plaintiff's request for his legal work was ignored and plaintiff again asked for a BP-10 form, which he was denied and discouraged from attempting to file a grievance; and on January 9, 2012, when plaintiff asked why he was being held in the SHU, he was told that "SIS (Special Investigation Services) would be talking to him."  Id.

On January 9, 2013, plaintiff was taken to an office where he found his legal papers "scattered about."  Id., ¶ 56.  Plaintiff was questioned about his political beliefs and during this meeting, various notes, books and other legal materials were confiscated and destroyed, including a habeas corpus practice book that he had been relying on for his "pending Supreme Court filing and potential 2255 filing," and which contained his research notes and materials.  Id.  Plaintiff was told he could not have

access to his legal work product until SIS finished their investigation.  Id.  Plaintiff claims that in addition to confiscating and destroying those items listed on a property confiscation form, there were more legal items taken and destroyed that were not listed on this form, including a book on appeals.  Id.  Plaintiff alleged these materials were "indispensable" for his filings and he was never able to replace them.  Id.

Plaintiff asserted that BOP staff admitted that their actions between January 9 and March 1, 2013, against plaintiff were done as a result of plaintiff doing legal work for others and himself.  Id., ¶ 57.  On February 20, 2013, more of plaintiff's legal materials were taken and destroyed, which prejudiced his attempts to file an appeal with the United States Supreme Court, and to file a habeas corpus petition under § 2255.  Id., ¶ 59.  These materials included books on statutory construction, presumptions and burdens of proof, and notes that plaintiff had taken from hours of legal research.  Id.

Plaintiff alleged that between December 22, 2012 and March 1, 2013, he was threatened on several occasions with a transfer to a higher security facility by defendants Daniel Gravdal and Brian Henrickson because of his "anti-government ideals" as evidenced by his possession of Sovereign Citizenship materials.  Id., ¶ 60. Plaintiff was told he would be "placed behind a fence" unless he told SIS where these materials were coming from.  Id.  During this same time period, plaintiff was denied any meaningful access to the grievance system and was intimidated to not use it through threats, implied threats, segregation conditions, and destruction of his property and by ignoring his requests for access to the system.  Id., ¶ 61.  Further, "several times" between December, 2012 and March, 2013, "SIS staff," (i.e. Gravdal and Henrickson), together with Anderson and another non-party (Kyla Winger), threatened to transfer

plaintiff to a higher security facility to punish him for engaging in constitutionally-protected acts, such as having political beliefs, engaging in legal work and assisting other inmates in preparing habeas corpus filings.  Id., ¶ 62.  On March 1, 2013, plaintiff was transferred to FCI-Sandstone for doing legal work for others and as a result of the discovery of Sovereign Citizen materials in his possession. Id., ¶ 64.

On arriving at FCI-Sandstone, plaintiff discovered that 83 of his postage stamps, which he possessed "for the sole purpose of sending out Court documents," were missing, and a $6.00 copy card issued at FPC-Duluth did not work at FCI-Sandstone. Id., ¶¶ 65, 66.  Since his transfer, plaintiff has been denied basic supplies to support his access to the courts such as paper, stamps and typing materials, and his request for these items without charge has been ignored.  Id., ¶ 66.  Additionally, plaintiff alleged that he had been unable to replace or reproduce his legal research materials and as a result, his appeal to the United States Supreme Court and § 2255 motions were "endangered."  Id., ¶ 67.

Plaintiff asserted the following legal claims against defendants.  First, plaintiff claimed that "the Warden" was "responsible" because the events described were not isolated, but represented "an unwritten policy and conspiracy to ignore and violate inmates' constitutional rights, in every area and level of [the FPC-Duluth], the Warden, of necessity be [sic] the primary responsible party."  Id., ¶ 69.  Plaintiff claimed that between December 12 and 17, 2012, "the Warden" and members of the mail room staff at FPC-Duluth, Anderson and Baker violated and conspired to violate his right to counsel and his access to the courts, attempted to coerce statements from him, forced him through intimidation to sign legal documents in Anderson's office without first

11

allowing him to read them "in further violation of due process," and denied him due process by forcing him to participate in the deposition without the witness fee. Id., ¶ 70. Further, by denying plaintiff the witness fee, these defendants hampered his attempts to contact the court or counsel.  Id.

Second, plaintiff claimed that between December 17 and 18, 2012, "Defendants Warden, Anderson, Baker, collectively" conspired to retaliate against him for exercising his constitutionally protected rights (such as his right to counsel, access to the courts, and due process) and conspired and did deprive him of access to the grievance system. Id., ¶ 71 (citing to ¶¶ 37-45 of the Statement of Facts).  Additionally, between December 19 and 21, 2012, these same defendants denied plaintiff access to the courts and retaliated against him by imposing sanctions.  Id., ¶ 72 (citing to ¶¶ 1-39 of the Statement of Facts).

Third, between December 22, 2012, and March 1, 2013, defendants "totally and collectively" denied plaintiff access to the courts, access to his protected legal work, violated work product protections, and reviewed in depth his legal work product, all in an attempt to "chill, frustrate and scare Plaintiff away from Court access."  Id., ¶ 73 (citing to ¶¶ 54-63 of the Statement of Facts).  Further, defendants violated plaintiff's right to due process by denying him access to the grievance system and by stealing and destroying his legal work, thereby "robbing Plaintiff of a chance to clear his name and obtain a reversal of his conviction and the $7,874,089.21 restitution order."  Id.  Plaintiff claimed that these actions caused him severe depression, anxiety, pain and continued to handicap his ability to meaningfully access the courts and hampered his "§ 2255 motion" – "his last and seemingly only hope of post-conviction relief."  Id.

Lastly, plaintiff alleged that defendants retaliated by moving him from FPC-Duluth to FCI-Sandstone and by stealing or destroying his 83 stamps, which he needed to mail his appeals.  Id., ¶ 74 (citing to ¶¶ 64-67 of the Statement of Facts).

As relief, plaintiff sought a declaration that defendants' actions were unconstitutional; a preliminary and permanent injunction ordering defendants to "cease any furtherance of their illegal activities and attempts to retaliate against plaintiff;" compensatory damages in the amount of $7,874,089.21 or punitive damages in the same amount plus $50,000 against defendants Anderson, Baker, "Warden," "Grabdoll" (i.e. Gravdal) and "Brian H." (Brian Henrickson); the appointment of counsel to assist him in the instant lawsuit; and an award of attorneys' fees.  Amended Complaint, Prayer for Relief, ¶¶ 76-80.

On December 8, 2014, plaintiff filed a document entitled "Supplement to Amended Complaint."  [Docket No. 72].  Plaintiff amended paragraph 67 of the Amended Complaint to specify that the legal materials that defendants destroyed consisted of "declarations and documents" that proved that he is "factually innocent of the crimes for which he is currently incarcerated."  Id., p. 2.  Plaintiff amended paragraph 74 of the Amended Complaint to state that defendants violated his due process rights by denying him access to an attorney before they forced him to participate in the telephonic deposition; by attempting to force him to sign a statement of facts against his interest without first letting him read the document; and by retaliating against him "for not acquiescing to Defendant's [sic] various demands."  Id.  Plaintiff also added that his constitutional right of access to the courts and due process rights were violated by placing him in the SHU; by seizing, withholding and destroying his

legal documents, including "irreplaceable documents and declarations" that would have established his innocence; by denying him the "constitutionally protected assistance of other inmates" to prepare his certiorari petition and habeas corpus petition; by denying him access to the grievance system; and by destroying evidence of defendants' unconstitutional and retaliatory acts.[13]  Id., pp. 3-4.

### C.   Procedural History

Defendants moved to dismiss the Amended Complaint, contending that plaintiff failed to exhaust his administrative remedies pursuant to the requirement of the Prison Litigation Reform Act that prisoners exhaust their administrative remedies before filing suit.  Defendants' Memorandum in Support of Motion to Dismiss, pp. 3-8 [Docket No. 50].  Defendants conceded that "inmates cannot be required to exhaust administrative remedies when prison officials have prevented them from exhausting," (id., p. 5), but contended that plaintiff's allegations that officials at the FPC-Duluth prevented him from exhausting his remedies did not excuse him from pursuing his remedies when he was transferred to FCI-Sandstone.  Id., p. 7.  Plaintiff opposed this motion, contending that after being removed from FPC-Duluth and while housed at the Douglas County, Wisconsin jail awaiting transfer to FCI-Sandstone, he made numerous requests to be provided with access to the grievance process, which were denied. Plaintiff's Memorandum in Opposition to Motion to Dismiss, p. 9 [Docket No. 56]. Plaintiff further argued that expecting him to exhaust his administrative remedies regarding actions that occurred at FPC-Duluth when he was transferred to FCI-Sandstone was contrary to BOP policy, which states that the institution where the

---

[13]   This "supplement" was filed after defendants had answered the Amended Complaint.  Defendants never filed a response to this supplemental pleading.

request was first given remains responsible for logging in and responding to the request. Id., p. 11. Plaintiff attached copies of a cop-out dated December 27, 2012, seeking postage and supplies; two cop-outs dated January 2, 2013, seeking a BP-10 form; another cop-out dated January 5, 2013, again seeking a BP-10 and noting that his previous requests had not been acknowledged; a cop-out dated January 8, 2013, stating that he was being threatened and intimidated and told that "any administrative remedy would be futile;" an "Inmate Request Form" from the Douglas County Jail dated January 18, 2013, stating that staff at the FPC-Duluth were retaliating against him, depriving him of court access and that he was in danger of losing his appeal rights. [Docket No. 56-2]. Plaintiff asked for a "BP90110" [sic] form, or asked that the FPC-Duluth Warden accept the Douglas County form instead. Id. Plaintiff did receive a reply to his January 2, 2013, cop-out asking for a BP-10 form, which read "Submit a new cop-out clarifying your concerns." [Docket No. 56 at 6]. The officer who responded told plaintiff that he would only get a BP-10 form if SIS approved. Id. at 8.

Magistrate Judge Keyes recommended that defendants' Motion to Dismiss be denied, citing plaintiff's documented efforts to obtain grievance forms and finding:

> On consideration of the record pertinent to this motion, this Court cannot conclude that as a matter of law the Plaintiff has failed to exhaust his remedies. Exhaustion of administrative remedies is an affirmative defense and Defendants carry the burden of proving the defense . . . Plaintiff's allegations in this regard are largely unrefuted. And Plaintiff has made a showing that is, at a minimum, sufficient to raise the inference that he was prevented from accessing the BOP administrative remedy process.

Report and Recommendation dated September 30, 2014 [Docket No. 59]. The District Court overruled defendants' objections to this Report and Recommendation, adopted

the Report and Recommendation and ordered defendants' to answer the Amended Complaint.  Order dated October 10, 2014 [Docket No. 69].

Subsequently, defendants obtained an order allowing them to take plaintiff's deposition.  Order dated February 13, 2015 [Docket No. 76].  Plaintiff objected, claiming that he had already laid out, in "rich factual detail" all relevant aspects of his case and there was no need for a deposition.   [Docket No. 77].  The District Court overruled plaintiff's objections to the deposition.  Order dated March 3, 2015 [Docket No. 80].

Defendants have now moved for summary judgment, contending that plaintiff's claims failed under <u>Bivens</u> as to Warden Chris Nickrenz[14]and on qualified immunity grounds as to all other defendants.  Defendants' Memorandum in Support of Motion for Summary Judgment ("Defs.' Mem.") [Docket No. 142].  Plaintiff responded and cross-moved for summary judgment and at the same time moved to amend his complaint to add Patrick Thyen and Nickrenz as defendants.  Plaintiff's Motion Requesting Leave to Amend, p. 1 [Docket No. 154].  Plaintiff also moved for sanctions pursuant to Rules 11 and 56(h) of the Federal Rules of Civil Procedure for what he characterized as defendants' "false and misleading" summary judgment Reply brief.  [Docket No. 163].

## II.    PLAINTIFF'S MOTION FOR LEAVE TO AMEND [DOCKET NO. 154]

Before turning to the cross-motions for summary judgment, the Court first considers plaintiff's motion for leave to amend his complaint.

Plaintiff sought leave to amend his Amended Complaint to substitute Patrick Thyen for the "unknown mail room staff" and Warden Chris Nickrenz for "Warden FPC Duluth."  Plaintiff's Motion Requesting Leave to Amend, p. 1.  Plaintiff claimed that he

---

[14]    The Amended Complaint named "Warden FPC-Duluth" and defendants identified him as Nickrenz.

could not move to amend until defendants filed their motion for summary judgment and submitted declarations from Thyen and Nickrenz.  Id., p. 2.  The Court construed this argument to mean that until plaintiff read the declarations, the identities of Thyen and Nickrenz were still unknown to him.  Plaintiff submitted that no prejudice would result from his amendment and stated that he did not move in bad faith or for delay.  Id., p. 2. Plaintiff asserted that under the liberal standard of Rule 15(a), the Court should allow his proposed amendments.  Id., p. 1.

In their reply to their motion for summary judgment, defendants opposed the motion on futility grounds.[15]  Defendant's Reply Memorandum In Support of Motion for Summary Judgment ("Defs.' Reply"), pp. 4-5 [Docket No. 160].  Nickrenz did not begin to work at FPC-Duluth until January 14, 2013, and therefore, could not have been "the Warden" referenced in the Amended Complaint or in the allegations raised in plaintiff's Response.  Defs.' Mem., p. 19; Defs.' Reply, pp. 4-5; Declaration of Chris Nickrenz ("Nickrenz Decl."), ¶¶ 2-6 [Docket No. 148].  Further, Nickrenz had no recollection of any interactions with plaintiff.  Nickrenz Decl., ¶ 5.  As for Thyen, defendants claimed Thyen was entitled to qualified immunity for his actions.  Defs.' Reply, pp. 5-6.

The deadline for motions for leave to amend was December 5, 2014.  Pretrial Scheduling Order, p. 2 [Docket No. 71].  Rule 16(b) governs the amendment of pleadings once a scheduling order's deadline for amendments has passed.  Pursuant to Rule 16(b), a schedule "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Similarly, Local Rule 16.3(b) states that a party who moves to modify a scheduling order must: (1) establish good cause for the proposed

---

[15]     Defendants did not respond separately to plaintiff's Motion for Leave to Amend.

modification; and (2) explain the proposed modification's effect on any deadlines. "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 717 (8th Cir. 2008).

Further, "[w]hen a motion to amend is filed after the expiration of the applicable deadline in the Court's Scheduling Order, Rule 15(a)'s permissive test no longer applies and instead the tougher 'good cause' standard applies under Rule 16(b)(4)." Target Corp. v. LCH Pavement Consultants, 960 F. Supp. 2d 999, 1004 (D. Minn. 2013). "[T]he application of Rule 16(b)'s good-cause standard is not optional." Sherman, 532 F.3d at 716 (quotation omitted). "[T]o permit district courts to consider motions to amend pleadings under Rule 15(a) without regard to 16(b) would render scheduling orders meaningless and effectively . . . read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." Target Corp., LLC, 960 F. Supp. 2d at 1004. When the "good cause" standard is not met, leave to file an untimely amendment must be denied and it is unnecessary to consider other grounds for denial. Weber v. Travelers Home & Marine Ins. Co., 801 F. Supp. 2d 819, 830 (D. Minn. 2011).

Plaintiff represented that only when he was provided with the declarations submitted by defendants in connection with their summary judgment motion, did he learn the identity of "the Warden" and "mail room staff" (i.e. Nickrenz and Thyen). Defendants did not dispute plaintiff's explanation for his belated motion to amend. The Court accepts plaintiff's explanation and finds that there is good cause to allow the substitution of Chris Nickrenz for "The Warden" and Patrick Thyen for "mail room staff."

Defendants' futility arguments will be addressed in the Court's analysis of defendants' summary judgment motion.

## III.    LEGAL STANDARDS

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  Thus, a court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  Anderson, 477 U.S. at 248.  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).  "In evaluating the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence."  Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1098 (8th Cir.1996); see also JRT, Inc. v. TCBY Sys., Inc., 52 F .3d 734, 737 (8th Cir.1995) ("[A] successful summary judgment defense requires more than argument or re-

allegation; [the party] must demonstrate that at trial it may be able to put on admissible evidence proving its allegations.").

When ruling on a motion for summary judgment, the Court is not required to adopt the plaintiff's version of the facts when those facts are "so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." Reed v. City of St. Charles, Mo., 561 F.3d 788, 790 (8th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'" Id. at 790-91 (citations and internal quotation omitted). Thus, summary judgment may be appropriate when the only evidence to support a plaintiff's allegations is his own testimony. LaCross v. City of Duluth, Civ. No. 10-3922 (JNE/LIB), 2012 WL 1694611, at *9 (D. Minn. May 14, 2012).

When considering a motion to dismiss or for summary judgment, pleadings submitted by pro se litigants are held to less stringent standards than formal pleadings drafted by lawyers. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam). Nevertheless, claims of even a pro se plaintiff cannot survive a motion for summary judgment unless the plaintiff has set forth specific facts demonstrating that there is a genuine issue for trial. See Quam v. Minnehaha Cnty. Jail, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

IV.     **DISCUSSION**

A.     <u>**Claims Against Nickrenz**</u>

Plaintiff alleged that he submitted a cop-out to "the Warden," (Nickrenz), on December 14, 2012, protesting the "order" that he participate in the deposition without receiving the witness fee, (Amended Complaint, ¶ 22), and summarily alleged that "the Warden" violated his constitutional rights to due process, access to the courts and retaliated against him for engaging in constitutionally protected activities. <u>Id.</u>, ¶¶ 70-73. Defendants argued that claims against Nickrenz could not proceed because, as required by <u>Bivens</u>, plaintiff had failed to establish Nickrenz's personal involvement in any of the acts alleged in the Amended Complaint or plaintiff's deposition. Defs.' Mem., p. 18. Nickrenz was at FPC-Duluth from January 14 to January 18, 2013, on temporary duty status and did not become Warden until January 27, 2013. <u>Id.</u>, p. 19 (citing Nickrenz Decl., ¶¶ 3, 4). Therefore, plaintiff's allegations that Nickrenz was involved in the events leading up to and surrounding the deposition on December 17, 2012, did not respond to plaintiff's cop-outs on December 14, 2012, and did not respond to his requests for indigent supplies and access to his legal work while he was housed in the SHU, all failed. <u>Id.</u>, p. 19; Defs.' Reply, p. 4.

Plaintiff responded that he has alleged a conspiracy for which all parties to the conspiracy, including the Warden, are vicariously liable for the underlying acts of the conspirators so long as they are foreseeable. Pl.'s Response, pp. 1-3, 43-44. Plaintiff maintained that the evidence would show that "the Warden" (along with the other defendants) was "aware of key facts constituting the violations at issue . . . ." <u>Id.</u>, p. 44. In support, plaintiff stated that "the evidence will show" that "the Warden" admitted that

he had received, read and ignored plaintiff's cop-outs dated December 14, 2012, regarding the scheduled deposition, the Minnesota statute and procedural rule bearing on subpoenas for depositions, why plaintiff was entitled to the $20 witness fee, and plaintiff's explanation as to why he could not be forced to appear at the deposition. Pl.'s Facts and Evid., ¶ 28 (citing Declaration of Bahram Samie ("Samie Decl."), Ex. 10 (Spencer Dep.), pp. 13, 15-18, 37 [Docket No. 151-10]), ¶ 29, ¶ 77. Additionally, plaintiff stated that while in the SHU, he made additional requests to the Warden in writing. Id., ¶ 77 (citing Spencer Dep. pp. 7, 8, 10, 81); Doc. No. 11 (Memorandum by Plaintiff in Support of Motion to Reconsider Order)).[16]

In his deposition, plaintiff testified that "the Warden" did not respond to his request for indigent supplies in connection with the December 17, 2012 deposition; "the Warden" did not respond to his December 14, 2012 cop-out regarding the deposition; and "the Warden" did nothing with respect to his complaints while he was housed in the SHU about access to his legal work and requests for legal supplies. Samie Decl., Ex. 10 (Spencer Dep.), pp. 8-10, 13.

The Court concludes that defendants' motion as to plaintiff's claims made against "the Warden" or Warden Nickrenz should be granted. Plaintiff's claims fail to meet the

---

[16]   The Court has reviewed the pages of plaintiff's deposition transcript cited by plaintiff. Pages 7 and 8 do not describe any acts by "the Warden." At page 10, plaintiff described someone called "the acting warden" who came through the SHU once a week at which time plaintiff would reiterate his request for his legal work product. At page 13 plaintiff testified that "the warden or acting warden" told plaintiff he would get him his legal supplies and that he would follow up with SIS to make sure that happened. There are no references to "the Warden" at pages 15-18, 37 or 81. Docket Number 11 is a five-page handwritten memo by plaintiff, apparently in support of his 22-page, handwritten motion for reconsideration of Magistrate Judge Boylan's Order that he pay an initial filing fee of $2.62. [Docket No. 6]. Plaintiff's memo described conduct by "the defendants" but does not refer specifically to 'the Warden" or Nickrenz.

standard of a <u>Bivens</u> pleading, which requires a plaintiff to allege that each <u>particular</u> <u>defendant</u> is liable based on their <u>own actions or omissions</u>.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Further, "[t]he general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability."  <u>Estate of Rosenberg by Rosenberg v. Crandell</u>, 56 F.3d 35, 37 (8th Cir. 1995).

Nickrenz could not have been the individual at FPC-Duluth to whom plaintiff submitted a cop-out on December 14, 2012, for the simple reason that Nickrenz was not there.  Nickrenz Decl., ¶¶ 3, 4 (stating that he was at FPC-Duluth on temporary duty from January 14 to January 18, 2013, and was appointed Warden on January 27, 2013).  Similarly, Nickrenz could not have been involved in denying plaintiff access to indigent legal supplies in connection with the deposition, which took place on December 17, 2012, as Nickrenz was not there.  Nor could Nickrenz be responsible for what plaintiff has alleged was the "systematical" failure to address his grievances, as the grievances he enumerated in his Amended Complaint do not coincide with Nickrenz's dates of employment at the FPC-Duluth.  <u>Compare</u> Amended Complaint, ¶ 55 with Nickrenz Decl., ¶¶ 3, 4.

Lastly, while Nickrenz was temporary Warden from January 14-18, 2013, which overlapped with the time period when plaintiff was housed in the SHU, December 23, 2012[17] through January 18, 2013, Nickrenz has stated under oath that he could recall no interactions with plaintiff either at FPC-Duluth or at the Douglas County Jail in

---

[17]   Plaintiff stated he was placed in the SHU on December 22, 2012 and his property was not inventoried until December 23, 2012.  Pl.'s Facts and Evid., ¶ 57.

January and February, 2012.  Nickrenz Decl., ¶¶ 5, 6.  Plaintiff's general allegations that he submitted "written requests to the Warden" or made requests to the "Warden" for access to his legal materials or legal supplies while housed in the SHU, are insufficient to contradict Nickrenz's sworn testimony, much less create a genuine issue of material fact for trial.  Moreover, as set out below, even if plaintiff is correct that the Warden did nothing in response to plaintiff's requests, Nickrenz, like the other defendants, is entitled to qualified immunity and plaintiff's claim of a conspiracy will not defeat that defense.

### B.    Claim Against Thyen Regarding the Witness Deposition Fee

Plaintiff alleged that "members of the mail room staff" told plaintiff that the issue of the witness fee check would have to be resolved and that plaintiff should look for further information from Anderson.  Amended Complaint, ¶¶ 14, 16.

Defendants asserted that because plaintiff had failed to identify any government official who denied him his deposition fee, his claim against all of the defendants regarding the fee should be dismissed.  Defs.' Mem., p. 19.  In particular, defendants maintained that the Warden, Baker and Anderson had no involvement in the decision to reject the fee, and plaintiff never identified or served the persons he described as the "mailroom staff."  Id. (citing Nickrenz Decl., ¶ 3; Anderson Decl., ¶ 5; Baker Decl.,¶ 35).

As stated above, plaintiff moved to substitute Thyen for his allegations about mailroom staff, and then in his response to defendants' motion for summary judgment, plaintiff argued that he had a Fourteenth Amendment liberty interest in the $20 witness fee, and he was deprived of this witness fee in violation of state law governing the payment of witness fees.  Pl's Response, pp. 49-50.  In support, plaintiff described the following statements and conduct by Thyen.  On December 12, 2012, Thyen paged

24

plaintiff to an office, and when he arrived at the office, Thyen threatened plaintiff with a disciplinary citation and "shipment on the next bus." Id., ¶¶ 1-4.  As a result, plaintiff stated "the evidence will show that Thyen was predisposed with ill-will toward Spencer." Id., ¶ 4.  Plaintiff further contended that the check for the witness fees was a business check and that the process server explained to Thyen the requirements of the Minnesota statute governing witness fees, how the statute applied to plaintiff, and the necessity of delivering the check to plaintiff.  Id., ¶¶ 5, 7.  Thyen acknowledged that he understood the legal significance of the check, but then stated that "considering Spencer's attitude," he would "decide the issue later" after talking with plaintiff's counselor.  Id., ¶ 10.  Plaintiff called the process server and informed him that Thyen had changed his mind and may not give him the funds; Thyen got angry at plaintiff; plaintiff told the process server that he would not participate in the deposition; the process server told Thyen again that the witness fee had to be given to plaintiff; Thyen told the process server "everything is fine;" and after the process server left, Thyen stated that he most likely would not give plaintiff the check, and he intended to call plaintiff's counselor to report his "attitude" and "need for adjustment, and the counselor could "deal with" plaintiff.  Id., ¶¶ 11-15.

In their reply, defendants first objected to plaintiff's statements about Thyen as he did not disclose them in his deposition or in his answers to written interrogatories.[18]

_____

[18]   Defendants served written discovery on plaintiff and the Court ordered plaintiff to respond no later than December 7, 2015.  Order dated November 23, 2015 [Docket No. 135].   Notwithstanding plaintiff's contention that he served his responses to this discovery on October 23, 2015 (a month before the Order on the motion to compel was issued), defendants stated that they did not receive plaintiff's answers until they were filed on CM/EFC on February 10, 2016, in connection with his motion for leave to amend.  See Plaintiff's Response to Interrogatories [Docket No. 154-2]; Defs.' Reply,

Defs.' Reply, pp. 1-3 (citing Samie Decl., Ex. 10 (Spencer Dep.)).   Defendants requested that plaintiff's Response be disregarded.  Defs.' Reply, pp. 1-4 (citing Scott v. Wells Fargo Bank, N.A., 10-cv-3368 (MJD/SER), 2011 WL 3837077 at *10 (D. Minn. Aug. 29, 2011) ("Plaintiff cannot, late into the litigation of this matter, assert unpled allegations in an effort to avoid summary judgment."); Products Co. v. Donaldson Co., Inc., 313 F.Supp.2d 951, 1023 (N.D. Iowa 2004) (striking any references to documents and testimony that parties had not been able to fully explore during depositions)). Defendants then contended that notwithstanding these facts, Thyen was entitled to summary judgment based on qualified immunity.  Id., p. 5.  Defendants argued that Thyen's decision to reject the $20 check was reasonable under the circumstances and his interpretation of BOP policy, and at any rate, plaintiff was not deprived of his statutory right as he ultimately refused to answer any questions at the deposition.  Id. Further, whether the check was a business check, as alleged by plaintiff, (Pl.'s Facts and Evid., ¶ 5), or a personal check as alleged by Thyen (Declaration of Patrick Thyen ("Thyen Decl."), ¶ 5 [Docket No. 149]), was irrelevant, as Thyen's actions, even if incorrect, did not rise to a constitutional violation.  Defs.' Reply, p. 5, n.2.

Defendants also maintained that there could be no violation of due process for negligent or intentional deprivation of property, if a meaningful post-deprivation remedy exists.  Id. (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984)).  Plaintiff could have

---

p. 3, n.1.  At any rate, plaintiff refused to answer any of the interrogatories because they were directed to "David C. Larson" not to plaintiff – a mistake by the defendants.  Defs.' Reply, p. 3, n.1.  Defendants never re-served plaintiff with this written discovery, nor sought any relief from the Court to obtain substantive responses to his "meaningless" answers.  Id.

submitted an administrative claim under 31 U.S.C. § 3723(a)(1) for the $20 fee.  Id.  His failure to do so precludes his Bivens claim against Thyen for the witness fee.  Id.

"Under the doctrine of qualified immunity, a court must dismiss a complaint against a government official in [her] individual capacity that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Hager v. Arkansas Dep't of Health, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In addressing a claim of qualified immunity, the Court must consider (1) "whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right;" and (2) "whether the right was clearly established at the time of the alleged infraction."  Hager, 735 F.3d at 1013–14.  If both of these questions are answered affirmatively, then the official is not entitled to immunity.  Id.  Conversely, "if the answer to either of these question is no," then the public official is entitled to qualified immunity.  Doe v. Flaherty, 623 F.3d 577, 583-82 (8th Cir. 2010).  A constitutional right is clearly established if "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates [the plaintiff's right]."  Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Thyen has stated he discussed the witness fee with the process server and the check appeared to be drawn on the process server's personal account.  Thyen Decl., ¶ 5.  There was no business name on the check.  Id.  As inmates are not allowed to receive personal funds through the mail, Thyen investigated whether plaintiff could keep the check, and learned he could not.  Id., ¶ 6; see also Declaration of John Upton

(stating that personal checks cannot be accepted through the BOP's deposit system and are returned to the senders) [Docket No. 150]. Thyen returned the check to the process server. Thyen Decl., ¶ 7.

On the basis of the record, the Court has concluded that Thyen is entitled to qualified immunity and defendants' motion with respect to Thyen's refusal to give plaintiff the witness fee should be granted. First, the Court rejects plaintiff's contention that he suffered a constitutional injury by Thyen's refusal to give him the witness fee. As defendants pointed out, plaintiff could have submitted an administrative claim under the BOP's small claims settlement process, 31 U.S.C. § 3723(a)(1), for the fee, thus mitigating any alleged due process violation. See Plummer v. Debbo, Civ. No. 6:10-1224, 2011 WL 2036349, at *1 (D.S.C. May 24, 2011) (no due process violation for lost property when there are adequate remedies through the BOP's small claims settlement procedures); Declaration of Shannon Boldt [Docket No. 145] (stating that she was familiar with the BOP's administrative tort claims process; she searched the BOP's database and could not locate any claims filed by plaintiff).

Second, as set out in the next section, there is no federally constitutionally protected liberty interest at stake with respect to the payment or non-payment of a state-mandated witness fee, particularly where, as here, a deponent never actually becomes a "witness" (i.e. is never sworn and provides no testimony).[19] See Samie Decl., Ex. 9 (transcript of telephonic deposition of plaintiff).

---

[19]   Any property interest in the fee is discussed infra, in connection with plaintiff's claim that he was denied due process when Thyen did not permit him to keep the witness fee.

For all of these reasons, this Court recommends that defendants be granted summary judgment on plaintiff's claim against Thyen arising out his refusal to provide plaintiff with the witness fee.

### C.    Claims Based on Access to the Courts

Plaintiff claimed that he was denied access to the courts when he was forced by Anderson to participate in the deposition on December 17, 2012; when he was coerced by Anderson to sign documents at the deposition without being allowed to read them; and when he was denied the $20 witness fee, which he needed to contact his own attorney, the attorney conducting the deposition or the court.   Amended Complaint, ¶ 70.  Plaintiff further claimed that his constitutional right to access to the courts was violated when he was placed in the SHU; by the seizure, withholding and destruction of his legal materials, including legal books, papers, materials, notes, memos and other legal materials needed to draft and file his petition for writ of certiorari to the United States Supreme Court in his criminal case and his § 2255 petition; by denial of his requests for his legal work product; by denial of access to the prison grievance process; and by the taking of his 83 stamps.  Id., ¶¶ 55, 56, 58-61, 65, 66.

Defendants moved for summary judgment on plaintiff's access to the courts claims, contending that they are entitled to qualified immunity on each of these claims. Defs.' Mem., pp. 20-27; Defs.' Reply, p. 6.

### 1.    Plaintiff's Claims Arising Out of the Deposition

Defendants contended that plaintiff could not establish a right of access to the courts regarding the deposition witness fee for the deposition because the deposition was unrelated to his criminal conviction, sentence or conditions of confinement at FPC-

Duluth.  Defs.' Mem., pp. 21-22 (citing Lewis v. Casey, 518 U.S. 343, 355 (1996); Hartsfield v. Nichols, 511 F.3d 826, 831-32 (8th Cir. 2008); White v. Kautzy, 494 F.3d 677, 680 (8th Cir. 2007)).  Additionally, insofar as plaintiff had alleged that he had a right to counsel in connection with the deposition, that claim failed because there is no constitutional right to counsel in a civil case.  Id., p. 23 (citing Glick v. Henderson, 855 F.3d 536, 541 (8th Cir. 1988)).  Further, even though plaintiff believed he was entitled to the witness fee by Minnesota statute, a violation of state law does not create a constitutional violation cognizable under Bivens.  Id., p. 23 (citing Whisman v. Rinehart, 119 F.3d 1303, 1312 (8th Cir. 1997)).

Plaintiff responded that Minnesota statute governing witness fees created a Fourteenth Amended liberty interest by plaintiff in the $20 check.  Pl.'s Resp., pp. 49-50.

The Court finds that as a matter of law, plaintiff cannot state an access-to-courts claim for defendants' refusal to permit him to retain the state deposition witness fee.

"[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."  Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983) (citing California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)).  To state a claim for relief, a plaintiff must allege that he or she suffered an actual injury caused by the limited access, such as the inability to file a complaint or the dismissal of a claim.  See Lewis, 518 U.S. at 351; Bandy–Bey v. Crist, 578 F.3d 763, 765 (8th Cir. 2009) (access to the courts claim requires "actual injury"); White, 494 F.3d at 680 ("To prove a violation of meaningful access-to-courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a

court of law, which resulted in actual injury, that is, the hindrance of a non-frivolous and arguably meritorious underlying legal claim."); see also Lewis, 518 U.S. at 353 (to prove "actual injury" a plaintiff must show "that a nonfrivolous legal claim had been frustrated or was being impeded."). The actual injury requirement is an element of standing. Lewis, 518 U.S. at 349.

In Lewis, the Supreme Court observed that "the injury requirement is not satisfied by just any type of frustrated legal claim. Nearly all of the access-to-courts claims in the Bounds [v. Smith, 430 U.S. 817 (1977)] line involved attempts by inmates to pursue direct appeals from the convictions for which they were incarcerated." Id. at 354. The Court further noted that it had "only slightly" extended the universe of relevant claims to include civil rights actions "to vindicate 'basic constitutional rights,'" because the dividing line between such actions and habeas petitions was not always clear. Id. (citations omitted). The Court explained:

> Significantly, we felt compelled to justify even this slight extension of the right of access to the courts, stressing that "the demarcation line between civil rights actions and habeas petitions is not always clear[ ]" . . .
>
> In other words, Bounds does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."

Id. at 355 (citations omitted); see also White, 494 F.3d at 680 ("to prove a violation of the right of meaningful access to the courts, a prisoner must establish that the state has

not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguable meritorious underlying legal claim.") (citations omitted); Canell v. Multnomah Cty., 141 F. Supp. 2d 1046, 1056 (D. Oregon 2001) ("Jail authorities are not under any affirmative constitutional obligation to assist inmates in general civil matters.").

Plaintiff's access-to-courts claim arising out of Thyen's refusal to hand over the witness fee check so that plaintiff could use the money to contact counsel or the court, and Anderson's directive that plaintiff proceed with the deposition even though plaintiff had not received the check, fails for the simple reason that the deposition arose out of a civil matter and had nothing to do with a claim challenging his sentence or conditions of confinement in a court of law.

Further, there is no constitutional right to an attorney in a civil matter. Glick, 855 F.3d at 541. Therefore, to the extent plaintiff's access-to-courts claim is premised on an assertion that he was denied right to counsel in connection with the deposition, that claim fails as well.

Finally, plaintiff's contention that he was denied access to the courts because he deprived of the $20 witness fee, is meritless. First, plaintiff's alleged inability to contact the deposing lawyers or the court in this civil matter does not involve the type of injury contemplated by Lewis. Plaintiff does not have a constitutional right to have prison officials pay for costs associated with his desire to talk to civil lawyers who subpoenaed him in a civil matter unrelated to his criminal conviction, sentence, or the conditions of

his confinement.  See Canell, 141 F. Supp. 2d at 1056 ("Jail authorities are not under any affirmative constitutional obligation to assist inmates in general civil matters.").

Second, notwithstanding plaintiff's argument that he had a Fourteenth Amendment liberty interest in the witness fee, the Court finds otherwise.  As the Eight Circuit noted in Whisman,

> Alleged violations of state laws, state-agency regulations, and even state court orders do not by themselves state a claim under 42 U.S.C. § 1983. Only federal rights are guarded and vindicated by such statute.  Ebmeier v. Stump, 70 F.3d at 1013. Constitutional significance may attach only to certain interests created by state law and it is clear that not every transgression of state law may do double duty as a constitutional violation.  Id.  We must be extremely careful in examining claimed violations of state laws, regulations and court orders. Only in very limited and obvious circumstances will federal constitutional significance attach in these matters.

119 F.3d 1303, 1312 (8th Cir. 1997).  The Court does not find that a state-required witness fee for a third party deposition in a state civil case rises to the level of a liberty interest under the Fourteenth Amendment, particularly as here, where plaintiff refused to participate in the deposition.

Lastly, the Court concludes that plaintiff suffered no injury of constitutional dimension as a result of the deprivation of the witness fee.  To the extent that plaintiff argued that he had an absolute right not to participate in the deposition or to be forced to create any record (even a record of his failing to participate) does not lead this Court to find that he suffered any injury.  The undisputed facts are that plaintiff was subpoenaed, he was not allowed to retain the witness fee, and he never became a "witness" (in other words, he was never sworn and never answered any questions).

In sum, the Court concludes that defendants are entitled to summary judgment on all of plaintiff's access-to-courts claims based on the defendants' decision to deny him the $20 witness fee.

### 2. Plaintiff's Claims Arising Out of His Inability to Challenge His Criminal Conviction

Defendants contended that based on the undisputed facts, plaintiff was not prevented from filing a certiorari petition with the Supreme Court. Defs.' Mem., p. 24. Nor could plaintiff make out an injury with respect to his § 2255 petition, which was litigated to completion. Id., p. 25 (citing Samie Decl., Exs. 3-5) (habeas petitions and order). Defendants submitted the following facts in support of their motion.

Plaintiff was placed in the SHU on December 23, 2012, on suspicion of performing legal work for other inmates for a fee.[20] Declaration of Brian Henrickson ("Henrickson Decl."), ¶ 8 [Docket No. 147]. An inmate, A.B., had approached staff asking for help in retrieving his legal materials from plaintiff, who was doing legal work for him for half of A.B.'s weekly commissary allowance. Id., ¶ 7. Doing legal work for a fee constitutes conducting a business in violation of the BOP's disciplinary code. Declaration of Daniel Gravdal ("Gravdal Decl."), ¶ 3 [Docket No. 146]; Baker Decl, ¶ 22, Ex. H, p. 11 (BOP Program Statement 1315.07 governing inmates legal activities within the BOP). After plaintiff was placed in the SHU, his property was preliminarily inventoried. Henrickson Decl., ¶ 8. The inventorying officer found a handwritten document entitled "Universal Fee Structure" with various rates for legal work. Id. Henrickson searched plaintiff's legal materials to locate A.B.'s materials, which he

---

[20]  Ultimately, Henrickson and the SIS of FPC-Duluth concluded that while plaintiff had developed a legal fee schedule, he had not implemented it. Henrickson Decl., ¶ 23.

found, but denied reading any of the legal materials for content.  Id., ¶¶ 11, 12.  While

doing the search, Henrickson found packets labeled with other inmates' names and

plaintiff told Henrickson he had been doing legal work for other prisoners.  Id., ¶ 12.

Henrickson seized five books from plaintiff as contraband.  Henrickson Decl., ¶ 13.

These books were: 1) "Authority of the Law" by Charles Weisman; (2) "Citizenship and

Sovereignty" by Sovereignty Education and Defense Ministry; (3) "Habeas Corpus: Your

Passkey to Freedom;" (4) "Rules of Presumptions and Statutory Interpretations" and

(5) "The Redemption Manual."  Id.

Henrickson explained that "Authority of the Law" was written by Charles

Weisman, who is generally known in the law enforcement community as "one of the

most visible white supremacists promoting Sovereign Citizen ideology."  Id., ¶ 14.  The

BOP has determined that Sovereign Citizen materials are contraband.  Id., ¶ 5.

Henrickson determined that "Authority of the Law" advocated that existing laws are

invalid and non-binding and therefore, courts lack jurisdiction to render criminal

judgments.  Id., ¶ 14.  As a result, it was his belief that the book advocated criminal

activity and he deemed it contraband, which plaintiff could not possess.  Id.

"Citizenship and Sovereignty" and "Rules of Presumptions and Statutory

Interpretation' were published by the Sovereignty Education and Defense Ministry

("SEDM"), which does not advocate Sovereign Citizen ideology, but does encourage

individuals not to pay their federal income taxes, which Henrickson deemed to promote

criminal activity.  Id., ¶ 16.  "Rules and Presumptions of Statutory Interpretation" was

created by the SEDM for its members to submit to courts, and the document attempts to

limit the authority of the United States government to the District of Columbia.  Id.

Further, Citizenship and Sovereignty" and "Rules of Presumptions and Statutory Interpretation" belonged to another inmate and inmates are not allowed to possess another inmate's property.  Id., ¶ 17.

The book on habeas corpus belonged to the FPC-Duluth law library and inmates are not allowed to possess books belonging to the law library.  Id., ¶ 18.  The "Redemption Manual" "is the primary manual used by Sovereign Citizens" and encouraged individuals to use the UCC forms to place false liens on government employees.  Id., ¶ 19.  Henrickson determined that the "Redemption Manual" encouraged illegal activity and as a result was contraband.  Id.

Henrickson, who conducted multiple searches of plaintiff's impounded personal property, denied seizing or destroying any of the materials plaintiff identified in his deposition as having been taken from him.  Id., ¶¶ 24, 25; Samie Decl., Ex. 10 (Spencer Dep.), pp. 12-13).

Gravdal, the SIS Lieutenant, stated that he reviewed plaintiff's personal property with Henrickson and approached plaintiff about returning the legal materials that belonged to other inmates and plaintiff agreed.  Gravdal Decl., ¶ 4.  Plaintiff also had materials regarding the Sovereign Citizen movement, which are deemed contraband, so those materials were seized.  Id.  Apart from those two categories of materials, Gravdal denied taking any other legal work from plaintiff.  Id., ¶ 5.

Inmates in the SHU have access to legal materials and are able to prepare legal documents.  Baker Decl., Ex. H, p. 14 (BPO Program Statement).  When plaintiff was moved from the general population to the SHU, his property was inventoried and stored in the SHU property room.  Gravdal Decl., ¶¶ 9, 11.  In the SHU, inmates are limited in

the amount of property they can have in their cells due to heightened fire and safety concerns. Id., ¶ 8. SHU inmates are permitted to have one cubic foot of legal materials relating to an open, active, case. Id. SHU inmates are also granted access to the Electronic Law Library computer terminal on request. Id., ¶ 10. If an inmate wants to access the Electronic Law Library, he must submit a request to the Compound Officer. Id.

Plaintiff had thirty-six books, six inches of personal papers, eighteen inches of legal work, twelve pens and thirty-six stamps. Id., ¶ 11, Ex. A (inventories of personal property).

On December 26, 2012, plaintiff sent a cop-out to the "SHU Lieutenant" asking for his legal work product, supplies, legal books, postage supplies, typewriter and access to the FPF-Duluth's Electronic Law Library. Id., ¶ 12, Ex. B (Inmate Request to Staff form). Plaintiff stated that he needed these materials "in order to access the courts and due to a pending deadline to submit appellant [sic] work." Id. Someone responded the next day, advising plaintiff that he was allowed one cubic foot of legal material and directing him to write a cop-out to the compound officer. Id. Plaintiff was further advised "all indigent information is from Unit Team. No typewriters go into SHU. Law Library you can request to use on evening watch if time permits!" Id.

Plaintiff was transferred to FCI-Sandstone on February 21, 2013, and received his property on March 1, 2013. Baker Decl., ¶ 34; Samie Decl., Ex. 10 (Spencer Dep., p. 83).

Under BOP regulations, when an inmate transfers to another institution, the sending institution will ship at government expense two boxes of personal property to

the receiving institution.  Thyen Decl., ¶ 9, Ex. B (Program Statement 5880.08 (Inmate Personal Property)), pp. 12-13.   Generally, the BOP does not ship unauthorized property, open toiletries or food.  Id., ¶ 10.  Further, property that is in excess of the personal property limits of the FPC-Duluth are not shipped.  Id.  As an example, Thyen noted that FPC-Duluth inmates are only allowed a total of five books, so only five books would be shipped at the government's expense.  Id.  If an inmate has excessive amounts of personal property, he or she may ship it to a non-BOP address at his or her own expense.  Id., ¶ 11.

Thyen stated that on February 21, 2013, in preparation for plaintiff's transfer, he inventoried plaintiff's property and completed two Inmate Personal Property Record forms representing the two boxes of property to be shipped.  Thyen Decl., ¶ 12.  The first box contained one legal book, twenty-six inches of legal materials; and eighty-two first class stamps.  Id., ¶ 13, Ex. C (inventory).  Thyen stated that it was his practice to place all of the legal materials together, measure the stack and record the measurement on the form rather than itemize each legal paper.  Id.  The second box contained five books and another twelve inches of legal materials.  Id., ¶ 14, Ex. C.

When Thyen was packing plaintiff's property he determined that plaintiff had excess property, which could not be shipped.  Id., ¶ 15.  This property included thirty-six books.  Id.  According to Thyen, plaintiff was given the opportunity to select which books he wanted shipped to FCI-Sandstone and to decide what he wanted to do with the remaining books.  Id.  Plaintiff elected to dispose of some books and mail the others to a "Joseph" in Minneapolis, whose address he provided after he arrived at FCI-Sandstone. Id., ¶ 16, Ex. D (property inventory with redacted address for "Joseph").

Thyen used 82 of plaintiff's stamps to mail plaintiff's excess property to the address in Minneapolis provided by plaintiff, but then forgot to change the number of stamps on the inventory sheet.  Id., ¶ 17.  When plaintiff signed for his property at FCI-Sandstone, he did not object that any items were missing.  Id., ¶ 18.  Plaintiff has alleged that the missing stamps were "for the sole purpose of sending out court documents."  Amended Complaint, ¶ 65.

Plaintiff testified in his deposition that there was still time to file his petition for writ of certiorari after he arrived at FCI-Sandstone.  Samie Decl., Ex. 10 (Spencer Dep.), p. 20) ("But I think, you know, when I got off the bus here [at FCI-Sandstone] there was still time to file the Supreme Court petition, yeah.").  As for whether plaintiff understood that he could seek an extension of time to file the certiorari petition, plaintiff testified:

> Q. Well, what I'm more interested in is the request for an extension.  I think that's known very commonly known, you know, inmates that if they have difficulties, they can request extensions.
>
> A.     Maybe.
>
> Q.     I mean, was it like you had no idea that courts would do that sort of thing?
>
> A.     I don't know that that – I don't know that I thought about it that way. I don't know – I guess I can't really respond to that.  I . . .

Id., p. 19.  Plaintiff did not seek an extension to file his petition for a writ of certiorari.

Defendants argued that the undisputed facts show that plaintiff was not hindered in his ability to file a petition for writ of certiorari to the Supreme Court.  On November 7, 2012, the Eighth Circuit entered judgment affirming plaintiff's conviction and sentence.  United States v. Spencer, 700 F.3d 317, 324 (8th Cir. 2012).  On December 13, 2012,

the Eighth Circuit denied plaintiff's petition for rehearing en banc.  Samie Decl., Ex. 1 (8th Circuit appellate docket).  Therefore, plaintiff's deadline to file a certiorari petition was March 13, 2013, and additionally, plaintiff had until March 3, 2013, to file for a 60-day extension of time to file his petition.  Defs.' Mem., p. 3 (citing S. Ct. R. 13(1), (3) (5)).  Plaintiff did not file for an extension.  Id. (citing Samie Decl., Ex. 10 (Spencer Dep.) p. 17).

Likewise, defendants maintained that plaintiff could not show that he was hindered from pursuing his habeas petition as evidenced by the fact that he timely filed the petition and litigated it to conclusion.  Defs. Mem., p. 25.  On December 17, 2013, plaintiff filed petitions in the District Court, seeking habeas corpus relief pursuant to 28 U.S.C. § 2255.  Id., p. 3 (citing Samie Decl., Exs. 3, 4 (plaintiff's motions seeking habeas relief)).  The petitions were denied on July 21, 2014.  Samie Decl., Ex. 5 (Order denying petitions).  On February 11, 2015, the Eighth Circuit denied plaintiff's application for a certificate of appealability and dismissed his appeal.  Id., Ex. 6 (Judgment).[21]  While plaintiff blamed defendants for the fact that the District Court found his claims were procedurally defaulted, defendants submitted that they did not cause plaintiff to procedurally default on his claims.  Defs'. Mem., p. 25.  First, they did not prevent plaintiff from appealing his conviction to the United States Supreme Court, and second, the District Court found his claims were procedurally defaulted because he failed to raise them on direct appeal to the Eighth Circuit.  Id., pp. 25-26 (citing Samie Decl., Ex. 5, pp. 4-5 (Order on habeas petition)).

---

[21]     As stated previously, plaintiff filed a petition for writ of certiorari to the Supreme Court after the Eighth Circuit entered judgment regarding his habeas petition.  See 136 S.Ct. 1391 (2016) (summarily denying petition).

According to defendants, because plaintiff could not establish that he was prevented by them from filing his certiorari petition or litigating his habeas petition, he has suffered no injury, and defendants were entitled to summary judgment on this aspect of his Amended Complaint. Id., p. 25.

In his response to defendants' motion for summary judgment, plaintiff provided the following facts: the memos he had prepared had been confiscated, (Pl.'s Facts and Evid., ¶ 53 (citing Plaintiff's Response to Defendants' Amended Objection to Report And Recommendation, Ex. B (Declaration of John Anthony Spencer dated September 27, 2014 ("Spencer Decl.") [Docket No. 68]); affidavits he collected from other inmates documenting his requests for legal materials had been destroyed, (id., ¶¶ 78, 79 (citing Spencer Decl., ¶ 7)); numerous requests for his legal work product made verbally, in writing and via grievance forms, were denied (id., ¶ 80 (citing Affidavit by John Anthony Spencer and Devin Harrington dated February 5, 2013 [Docket No. 13])); during the SIS investigation, Gravdal and Henrickson "rudely denied" his request for his legal materials despite being told of his impending deadline for filing a petition for a writ of certiorari with the Supreme Court (Id., ¶ 87); upon transfer to FCP-Sandstone, 12 inches of legal materials were missing, including several affidavits, declarations, cop-outs to defendants requesting his legal work product, postage and permission to work on his appellate work, and new evidence in his underlying criminal case that would have proven his innocence (id., ¶¶ 107, 108); and as for those legal materials that did arrive at FCI-Sandstone, they were disorganized, staples had been removed, coffee stains were on many documents, and pages were ripped and missing from his appellate brief.

Id., ¶ 109.  As a consequence of defendants' conduct and plaintiff's mental health,[22] plaintiff stated it was impossible for him to request an extension from the Supreme Court.  Id., ¶ 111.  Plaintiff stated that he "did, in fact, raise all of the claims he sought to raise in the Supreme Court, and [sic] subsequently in his § 2255 petition."  Pl.'s Resp., p. 57.

The Court concludes that defendants' motion with respect to plaintiff's access-to-courts claims should be granted.  First, there are no disputed issues of material fact regarding defendants' alleged interference with the timing of plaintiff's filing a petition for a writ of certiorari.  After receiving his legal materials when he was at FCI-Sandstone on March 1, 2013, plaintiff still had time to file the petition.  Although plaintiff testified that he felt that his pleadings would not be up to snuff (Samie Decl., Ex. 10 (Spencer Dep.), p. 20-22), that is not sufficient to establish the "actual injury" required for an access-to-courts claim.

Second, it is undisputed that plaintiff filed not one, but two habeas corpus petitions under 28 U.S.C. § 2255.  See Samie Decl., Exs. 3, 4.  These petitions exhaustively briefed plaintiff's theories as to why he was entitled to relief.  Id., Ex. 4 (73-page habeas corpus petition raising five claims).  The District Court concluded that the claims were either without merit, or had been procedurally defaulted by plaintiff's failure to raise them on direct appeal to the Eighth Circuit.  United States v. Spencer, 2014 WL 3573600 (D. Minn. July 21, 2014).  There is no evidence that any action by any

---

[22] Plaintiff stated that his PSI indicated that he had been clinically diagnosed with bipolar disorder, mixed adjustment disorder, mixed disturbance of emotions and conduct, and borderline personality disorder.  Pl'.s Facts and Evid., ¶ 110.

defendant impeded or interfered with plaintiff's ability to file his habeas corpus petitions or that defendants were responsible for plaintiff's defaulted claims.

Third, to the extent plaintiff's access-to-courts claim is based on his assertion that the FPC-Duluth or FCI-Sandstone should not have limited the amount of legal documents or books he could retain or access while in the SHU or upon transfer to FCI-Sandstone, that claim fails.

On the one hand, as the Eighth Circuit explained:

> The taking of an inmate's legal papers can be a constitutional violation when it infringes his right of access to the courts. The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. We will not deny relief on the unsupported assumption that the papers involve only frivolous claims. Therefore, the destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest.

Goff v. Nix, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted).

On the other hand, the destruction or withholding of legal papers pursuant to a prison regulation, can be valid, even if it restricts a prisoner's constitutional rights, if that regulation is "reasonably related to penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). Turner describes the factors a court considers in making that determination. These factors are: (1) whether there is a valid, rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation. Id. at 89-91.

In <u>Cody v. Weber</u>, the court emphasized that <u>Goff</u> "demonstrates that an inmate's right of access to the courts is afforded protection, but that it must be balanced against the institutions legitimate interests. Thus, a prisoner's mere allegation of injury may not be legally sufficient to forestall summary judgment." 256 F.3d 764, 769 (8th Cir. 2001). The court found that the defendants in <u>Cody</u> had not come forward with any evidence of a penological interest sufficient to justify their search and review of plaintiff's legal papers and reversed the district court's grant of summary judgment on that claim. <u>Id.</u>

Here, defendants explained why there was a limit on the amount of materials an inmate could have in the SHU – inmates in the SHU are more limited in the amount of personal possessions they may retain because they are housed primarily in their cells, which heightens fire safety and sanitation concerns. Gravdal Decl., ¶ 8. Under the first <u>Turner</u> factor, therefore, there is a connection between the regulation governing the amount of materials permitted in the SHU and the BOP's interest in the health and safety of inmates in its custody. Second, even in the face of that limitation, inmates are allowed a certain amount of material, may request items that have been packed and stored, and can request access to the institution's Electronic Law Library. <u>Id.</u>, ¶ 10. As a result, under the second <u>Turner</u> factor, there are alternate means available to prisoners for exercising their rights – that is, the regulation does not preclude the exercise of their rights.

As to the third <u>Turner</u> factor, the Court has no difficulty concluding that prison officials could not accommodate a single inmate's request to be excused from the personal property limits in the SHU without there being a ripple effect throughout the SHU. Finally, under the fourth <u>Turner</u> factor, the Court finds that there is no ready

alternative to a policy that aims to protect the health and safety of all inmates. Significantly, other courts which have analyzed the regulations limiting the amount of personal property to be allowed in a SHU under the Turner factors have reached the same conclusion.  See Dunne v. Smith, Civ. No. 1:07-74, 2011 WL 1253652, at *5 (E.D. Cal. Mar. 31, 2011) (policy of banning all newspaper and magazines from the SHU was sound under Turner because it was implemented to address fire, sanitation and safety concerns); Davidson v. Scully, 914 F.Supp. 1011, 1016 (S.D.N.Y. 1996) (limitation on amount of furnishings and supplies allowed to inmates in the SHU reasonably related to legitimate penological interests under Turner); Zatko v. Rowland, 835 F. Supp. 1174, 1181 (N.D. Cal. 1993) (limiting SHU inmates to two newspaper or magazine subscriptions constitutionally sound under Turner as government submitted a declaration stating that the accumulation of publications in the SHU is a fire hazard).

Likewise, the Court finds Thyen's treatment of plaintiff's property sound under Turner.  Thyen stated that he shipped to FCI-Sandstone the amount of personal property permitted under the FPC-Duluth regulations, and then shipped the excess materials to the address provided by plaintiff.  Thyen Decl., ¶¶ 10-15.  Under the first Turner factor, a general limitation on amount of personal property an inmate may possess is reasonably related to the BOP's responsibility for the health and safety of the inmates in its custody.  See, e.g., Abdullah v. Anderson, Civ. No. 5:05-568, 2008 WL 4103980, at *14 (S.D.W.V. Sept. 2, 2008) (prison's regulation limiting the amount of personal property each inmate could have was sound under Turner because "if inmates were allowed to possess unlimited amounts of personal property . . . safety and sanitation concerns would arise which would impact other inmates and prison officials.")

Under the second Turner factor, plaintiff was permitted to have some of his personal property, but not the excess and as a result he had alternate means for exercising his rights. As to the third Turner factor, the Court again concludes that excusing plaintiff from the regulation imposed on other inmates would have an undesirable ripple effect. As to the fourth Turner factor, the Court finds that there is no ready alternative to a policy that aims to protect the health and safety of inmates and the security of the facility.

Fourth, there is no evidence that plaintiff sought from defendants (and was denied), or that defendants destroyed any specific materials critical to drafting his petition for a writ of certiorari or in connection with his habeas petition. Pl.'s Facts and Evid., ¶¶ 104-108. While plaintiff identified specific materials he claims were lost, destroyed or not transported to FCP-Sandstone, (Pl.'s Facts and Evid., ¶¶ 78, 79, 80, 87, 107-109), he only summarily stated that these materials "would have proven that [he] was innocent of the charges against him in his criminal case; that the prosecution conspired to elicit false testimony against him, and that no 'conspiracy' existed to conduct fraud."[23] Id., ¶ 108. Such general allegations are insufficient to establish actual injury.

---

[23]   In plaintiff's habeas petition, where he claimed prosecutorial misconduct in his underlying criminal case, the District Court found that plaintiff had procedurally defaulted on that claim by not raising it in his direct appeal and rejected his argument that he did not discover the evidence that bore on that claim until after the direct appeal had been resolved. United States v. Spencer, 2014 WL 3573600, at *3. The District Court then found that plaintiff could not overcome the procedural bar to habeas relief by showing his "actual innocence" stating:

> The record, however, is replete with evidence that does not support such a finding. Following ten days of trial, including the testimony of more than thirty witnesses, the jury returned

Finally, even accepting that the 12 inches of plaintiff's allegedly vital and exculpatory legal materials were not transferred from FPC-Duluth to FCI-Sandstone, it was incumbent on plaintiff to come forward with admissible evidence that this loss resulted from defendants' intentional decision to deny him access to the courts, not from their negligence. See Shannon v. Jacobowitz, 394 F.3d 90, 94 (2d Cir. 2005) ("By ruling in Daniels [v. Williams, 474 U.S. 327, 328 (1986)] that a negligent act could not amount to a constitutional deprivation, the Court ... clearly articulated that a finding of intentional conduct was a prerequisite to a due process claim."). This plaintiff did not do.

For all of these reasons, this Court finds that plaintiff has failed to state a violation of his right of access to the courts, and that defendants' motion for summary judgment based on qualified immunity, should be granted.

---

its verdict approximately two-and-a-half hours after receiving the case. See ECF No. 89. Moreover, tenable actual innocence gateway pleas are rare: a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find his guilty beyond a reasonable doubt. Here, even with the alleged new evidence, there was ample evidence from which a reasonable jury could have found Spencer guilty.

Id. Therefore, in light of the District Court's reasoning, to the extent plaintiff believed that the materials he described in his Response would prove him to be actually innocent, he needed to describe with specificity the contents of these materials and how they would have caused a different outcome in his habeas petition.

### D.    <u>Retaliation Claims</u>

Plaintiff alleged that he was transferred to the FCI-Sandstone in retaliation for doing legal work for other inmates and because he was found with anti-government, "sovereign citizen" materials, in his possession.  Amended Complaint, ¶ 64.  Further, plaintiff claimed that defendants' actions generally (disciplining him, destroying his 83 postage stamps, and denying him access to the courts and to the prison grievance system) were undertaken in retaliation for his engagement of constitutionally-protected acts "such as right to counsel, Court access and due process."  <u>Id.</u>, ¶ 71; Pl.'s Facts and Evid., ¶ 39.  Plaintiff also alleged that "members of the mail room staff" retaliated against him by denying him the $20 witness fee check and by denying him access to his postage stamps.  Amended Complaint, ¶¶ 70, 74.

Defendants contended that they were entitled to qualified immunity on plaintiff's retaliation claims related to the deposition because plaintiff did not exercise a clearly established constitutional right not to participate in the deposition; and he could not establish that the alleged retaliatory motive was the "but for" cause of his work detail change, placement in the SHU, search of his property, and transfer to FCI-Sandstone. Defs.' Mem., pp. 27-33.  Establishing a "but for" motive is a requisite element of a prima facie case of retaliatory discipline.  <u>Id.</u>, p. 27.

To establish a prima facie case of retaliatory discipline, a plaintiff must show that (1) he exercised a constitutionally protected right; (2) he was disciplined; and (3) his exercise of the right motivated the discipline.  <u>Meuir v. Greene Cty. Jail Employees</u>, 487 F.3d 1115, 1119 (8th Cir. 2007).  A plaintiff alleging retaliatory discipline bears a heavy evidentiary burden, and mere allegations that a prison official's conduct was

retaliatory do not suffice. See id. (citations omitted). Instead, the plaintiff must present "affirmative evidence" of a retaliatory motive. See Crawford–El v. Britton, 523 U.S. 574, 600 (1998); Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007). To establish the third element of a prima facie case for retaliatory discipline, an inmate must show that "but for" a retaliatory motive, the prison official would not have imposed the discipline. Haynes v. Stephenson, 588 F.3d 1152, 1157 (8th Cir. 2009) (citing Goff v. Burton, 7 F.3d 734, 737 (8th Cir. 1993)). "[A] defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' that the inmate actually committed a rule violation." Hartsfield, 511 F.3d at 829.

With these legal standards in mind, the Court examines plaintiff's specific contentions regarding retaliation.

### 1. Discipline for Appearing Late to the Callout

Anderson wrote up an incident report for plaintiff's failure to respond to the December 17, 2012, 7:50 a.m. callout that Anderson had imposed. Anderson Decl., ¶¶ 7, 12; Baker Decl., Ex. D. Plaintiff was an hour late for this callout. Id., ¶ 8. Anderson stated that inmate accountability was a fundamental principle of a correctional facility and that an inmate is expected to appear for a callout, even if he plans to refuse to participate in the callout. Id., ¶ 13. When plaintiff did not appear for the callout, his whereabouts were unknown for an hour and as a result, Anderson disciplined him. Id., ¶ 14, Ex. B (incident report). Even accepting plaintiff's explanation that he could not leave his work detail until the census was cleared, plaintiff's whereabouts were unaccounted for twenty minutes and Anderson would still have disciplined him. Id., ¶¶ 16, 17 (stating that census was cleared on December 17, 2012, at 8:30 a.m. and

plaintiff reported to Anderson's office at 8:50 a.m.).  The violation was upheld by a Unit Disciplinary Committee ("UDC") based in part on plaintiff's statement that he missed the callout because he did not want to do the deposition.  Baker Decl., Ex. D (Incident report, including Committee Action).

In response, plaintiff stated that Anderson's incident report was a pretext for retaliating against him for refusing to participate in the deposition.  Pl.'s Facts and Evid., ¶¶ 35-42; Samie Decl., Ex. 10 (Spencer Dep.), pp. 37-38.  In particular, plaintiff stated that in response to his threat to Anderson to file an institutional grievance, Anderson threatened plaintiff with a disciplinary citation, (Pl.'s Facts and Evid., ¶ 35); Anderson stated the reason for the disciplinary citation was plaintiff's refusal to participate in the deposition after being ordered to do so, (id., ¶ 39); by refusing to participate in the deposition, Anderson stated that plaintiff made Anderson "look bad" and as if he "could not control his inmates," (id.); Anderson stated that "R&D told me to hammer you if you acted up," (id.); and prior to the UDC hearing, Anderson sanctioned plaintiff by changing his work assignment from recreation to kitchen duty.  Id., ¶ 41*; see also* Samie Decl, Ex. 10 (Spencer Dep.), pp. 24, 78, 133, 141-42).[24]  In addition, plaintiff stated that when he approached Baker about the incident report and requested a grievance form, Baker denied the request, (Pl.'s Facts and Evid., ¶ 42); Baker warned plaintiff that filing grievances "could be hazardous to [his] level of comfort at FPC Duluth," (id.); and Baker threatened to call Anderson and tell Anderson that plaintiff had sought to write up Anderson.  Id.; see also Samie Decl, Ex. 10 (Spencer Dep.), pp. 37-41, 116-120).

---

[24]    Although cited by plaintiff in support of these alleged events, pages 37 to 41 and 116-120 of plaintiff's deposition transcript related more generally to plaintiff's purported efforts to obtain grievance forms.

The undisputed material facts related to the incident report are as follows.  The incident report by Anderson stated the violation was for failing to respond to the December 17, 2012, 7:50 a.m. callout.  Baker Ex. D (Incident Report).  Plaintiff admitted being placed on the callout list for 7:50 a.m. December 17, 2012.  Samie Decl., Ex. 10 (Spencer Dep.), p. 133).   Plaintiff admitted that he did not appear at 7:50 a.m., but claimed he appeared at 8:00 a.m. and the deposition started "five minutes or so later."  Id., p. 134.  Plaintiff admitted that the deposition transcript showed that the deposition began at 8:52 a.m.  Id.  Based on these undisputed facts, the Court finds that plaintiff has failed to establish that "but for" Anderson's alleged retaliatory motives, plaintiff would not have been written up, as by his own admission he did not appear for the callout at 7:50 a.m.

### 2.   Change of Work Detail

Plaintiff alleged that on December 18, 2012, he received a change in job assignment as a punishment his refusal to participate in the deposition.[25]   Amended Complaint, ¶ 41.  Anderson denied changing plaintiff's work detail in retaliation for not participating in the December 17, 2012, deposition.  Anderson Decl., ¶ 18.  At that time, plaintiff was assigned to the Recreation Department and Anderson switched his work detail to Food Service Clerk as a result of plaintiff's complaint that he did not hear Anderson's page on December 17, 2012.  Id., ¶ 22.  According to Anderson, he

---

[25]   Plaintiff did not flesh out the retaliatory nature of this job change in his Amended Complaint or Statement of Facts.  Consequently, the Court has no idea why the kitchen assignment would be less desirable than the recreation department assignment or some other assignment, much less why it even amounts to punishment or discipline.  At his deposition, plaintiff testified that he wasn't "interested in doing the kitchen job" and that he "didn't really want to work in the kitchen."  Samie Decl., Ex. 10 (Spencer Dep.), p. 144.

determined the switch was necessary to provide "a more supervised work environment where [plaintiff] would be more likely to hear his name being paged." Id.

Plaintiff responded that "the evidence would show" that he was sanctioned with a work detail change for his conduct relative to his refusal to participate in the deposition. Pl.'s Facts and Evid., ¶ 41.

The Court concludes that plaintiff failed to establish that "but for" Anderson's alleged retaliatory motives, he would not have reassigned plaintiff to kitchen detail. Plaintiff claimed that the reason he did not appear for the callout was that he could not hear Anderson's page in the recreation area. Anderson submitted that the reason for the job change was to place plaintiff in a location where he was more likely to hear the page. No evidence was offered by plaintiff to suggest that he it would just as likely (or unlikely) that he would hear a page in the kitchen. Anderson's legitimate explanation for the job change defeats any claim by plaintiff that "but for" Anderson's alleged retaliatory motives, this change in position would not have occurred.

### 3.    Placement in the SHU and Search of Property

The Amended Complaint did not explicitly allege that plaintiff was placed in the SHU or that his property searched and confiscated while he was there for retaliatory reasons, but those claims can be reasonably read into the Amended Complaint as a whole.

Defendants contended that plaintiff was placed in the SHU after A.B. reported to BOP staff that plaintiff had refused to return his legal work and was performing legal work for compensation, in violation of Program Statement 1315.07. Defs.' Mem., p. 30. Although inmates are permitted to assist one another with legal work, they may not

receive compensation for such assistance. Id. Therefore, once staff became aware that plaintiff was potentially involved in a violation of BOP policy, they had a legitimate reason for placing him in the SHU, and Henrickson and Gravdal had a legitimate, non-retaliatory reason for searching his property. Id., pp. 30-31. Even absent a finding that plaintiff was engaging in legal work for compensation, plaintiff was not permitted to possess other inmates' legal work or materials belonging to the law library, nor was he allowed to possess contraband. Id., pp. 31-32.

In support of defendants' motion, Henrickson stated that after hearing of A.B.'s allegations, plaintiff was placed in the SHU on suspicion of conducting a business. Henrickson Decl., ¶ 8. Plaintiff's personal property was impounded and preliminarily inventoried. Id. The officer conducting the search found a handwritten document titled "Universal Fee Structure," which listed a fee schedule for legal services. Id., Ex. B. Henrickson then initiated two parallel investigations: one into whether there was evidence that plaintiff was running a business, and the other into whether A.B. or plaintiff would be safe if returned to the general prison population. Id., ¶ 10. Henrickson conducted multiple searches of plaintiff's previously impounded property and he conducted a "cursory review" of plaintiff's legal materials for contraband due to A.B.'s allegation that plaintiff had possession of his legal materials. Id., ¶ 11. Henrickson denied reading plaintiff's legal materials for content. Id. During the property searches, Henrickson found legal packets with the full names of four other inmates on them, including A.B.'s name. Id., ¶ 12. Henrickson also found legal reference books with other inmates' names on them and the Sovereign Citizen materials previously described. Id. Gravdal helped Henrickson in reviewing plaintiff's personal property.

Gravdal Decl., ¶ 4.  Gravdal denied confiscating any materials other than the materials that belonged to other inmates and the materials deemed to be contraband.  Id., ¶ 5. Gravdal stated that he did not destroy any of plaintiff's books or legal materials.  Id.

In his response to defendants' motion, plaintiff stated that "the evidence would show" that defendants' explanations as to why plaintiff was placed in the SHU and his property searched were pretextual and these actions were actually taken to retaliate against him.  Pl.'s Facts and Evid., ¶¶ 71, 72.  Specifically, plaintiff stated that the "evidence will show" that he was set up by A.B. for the purpose of "protection by defendants;" A.B. provided the "universal fee schedule" document to defendants; the document was "planted" in plaintiff's property; and A.B. helped set up plaintiff to obtain a reward from defendants.  Id., ¶¶ 60-62, 65-66, 68, 70.

Plaintiff also stated that the inventory did not show that he had anything belonging to other inmates or contraband.  Pl.'s Facts and Evid. (citing Gravdal Decl., Ex. A (inventories)).[26]  Plaintiff further stated that after he was placed in the SHU, defendants "embellished the record" to conceal their conspiracy; another prison official wrote a memo after plaintiff had been placed in the SHU describing his discovery of the fee schedule; the accuracy of the inventory was never confirmed with plaintiff; and the inventories were ambiguous and contained inconsistencies sufficient to "question their accuracy and the veracity of the Defendants."  Id., ¶¶ 57-59, 62, 64, 71, 89-91.

To establish a retaliatory motive for his placement in the SHU and search of his possessions, plaintiff was required to establish that "but for" their alleged retaliatory

---

[26]    It is true that the inventories do not describe any particular materials as contraband or belonging to others.  Neither do they describe any of the property in detail.  For example, the inventory states that plaintiff had 26 books, but does not list the titles.  Gravdal Decl., Ex. A, p. 3.

motives, defendants would not have taken these actions.  See cases cited, supra; see also Muhammad v. Wiley, Civ. No. 06-11128, 2008 WL 4305779, at *3 (D. Colo. Sept. 18, 2008) (applying the "but for" standard to an inmate's claim that he was transferred to a SHU in retaliation for exercising his constitutional rights and concluding that prison officials had a valid penological interest in the placement, which was made pending an investigation and disciplinary hearing).  Plaintiff has not met this high hurdle.

To the contrary, the evidence before the Court is that based on inmate A.B.'s request for help in getting his legal materials back from plaintiff and report that plaintiff was performing legal work for him for compensation, plaintiff was placed in the SHU pending the FPC-Duluth's inquiry into whether he was conducting a business in violation of BOP Program Statement 1315.07.  Henrickson Decl., ¶ 8; Baker Decl., ¶ 28, Ex. H.  BOP Program Statement 1315.07 prohibits an inmate from performing legal work for other inmates for compensation.  Baker Decl., Ex. H, p. 11.  BOP Program Statement 1315.07 also prohibits an inmate from possessing other inmate's legal materials outside the main law library, unless the documents do not contain a case caption, document title, or the name of any other inmate. Id., p. 12.  Plaintiff's property was searched to determine if he was performing legal work for others for compensation and to locate A.B.'s materials.  Henrickson Decl., ¶¶ 10, 11.  Located within plaintiff's materials was a Universal Fee Structure setting forth a fee schedule for work to be performed by plaintiff, along with several legal packets with the complete names of several inmates, including A.B., and legal reference books with other inmates' names on them.  Henrickson Decl, ¶ 12.  Additionally, five books espousing the ideology of the "Sovereign Citizen" movement or other criminal activities were confiscated because

they promoted criminal activity and were deemed to be contraband.  Id., ¶¶ 13-19, Ex. A.

While ultimately it was determined that plaintiff was not running a business in violation of BOP policy and that he was safe to return to the general population, plaintiff submitted no admissible evidence to support his bald assertions that defendants' explanations and conduct were pretextual and retaliatory, much less that "but for" any alleged retaliatory motives by defendants, his placement in the SHU and search and confiscation of "Sovereign Citizen" materials would not have taken place.[27]  Defendants are entitled to qualified immunity on this retaliation claim.

### 4.  Transfer to FCI-Sandstone

Plaintiff alleged that he was threatened and then eventually transferred to FCI-Sandstone in retaliation for defendants' perception that he was doing legal work for others and for being in possession of "anti-government materials."  Amended Complaint, ¶¶ 60-62, 64.

Defendants explained that plaintiff was transferred to FCI-Sandstone because he needed to be separated from his co-defendant who had recently arrived at FPC-Duluth. Defs.' Mem., p. 32.  The BOP could have either transferred plaintiff or his co-defendant, however, based on plaintiff's incident report and pending investigation into further misconduct, as well as the recommendation of the prosecuting attorney, it was determined that it was reasonable to transfer him to another institution.  Id.  Although

---

[27]  The Federal Bureau of Investigation has classified "sovereign citizens" as domestic terror threats because they are anti-government extremists.  Colar v. Heyns, Civ. No. 12-1269, 2013 WL 141138, at *3 (W.D. Mich. Jan. 11, 2013).  On this basis, the court in Best-El Bey v. Paul, Civ. No. 3:14-132, 2014 WL 3749144, at *3 (W.D.N.C. July 30, 2014) rejected a claim that a prisoner had a First Amendment right to possess materials promoting the Sovereign Citizen ideology.

Henrickson and Baker recommended transfer to another minimum security facility or to an "appropriate" facility, it was the Designation and Sentence Computation Center ("DSCC"), which ultimately designated plaintiff to FCI-Sandstone rather than another prison camp. Id.

In support, defendants provided the following facts. While plaintiff was in the SHU pending the investigation into whether he was conducting a business, his co-defendant in his criminal case arrived at FPC-Duluth. Baker Decl., ¶ 29. Two co-defendants can be housed at the same facility, absent safety and security concerns that might necessitate separating them. Id. At the co-defendant's intake, it was discovered that he had testified against plaintiff, which according to Baker increased the risks of assault "as a majority of inmates do not like cooperators and 'snitches.'" Id., ¶¶ 30, 31. Baker also stated that FPC-Duluth staff had received information from the U.S. Attorney's office that led the BOP to conclude that plaintiff and his co-defendant needed to be separated. Id., ¶ 31. In recommending that plaintiff be transferred, Baker factored in the opinion of the prosecuting AUSA, the pending investigation into whether plaintiff was running a business, and the incident report that he was absent from the callout on December 17, 2012. Id., ¶ 32. Baker did not specifically ask that plaintiff be transferred to a secure facility rather than a prison camp. Id. Rather, the DSCC staff agreed with the transfer recommendation and re-assigned plaintiff to FCI-Sandstone. Id., ¶ 33.

In response, plaintiff stated that while he was housed at the Douglas County Jail, on February 4, 2013, a BOP officer named "Jackson" told him that his co-defendant should never had been sent to the same facility as plaintiff, the inmate with the longer sentence should not transferred, and the inmate closer to discharge is should be

transferred.[28]  Pl.'s Facts and Evid., ¶¶ 96 (citing Samie Decl., Ex. 10 (Spencer Dep.), pp. 110-114).

Inmates do not have a protected liberty interest in assignment to a particular prison.  Moorman v. Thalacker, 83 F.3d 970, 973 (8th Cir. 1996) (citing Meachum v. Fano, 427 U.S. 215, 224 (1976)).  "Such assignments are discretionary, so long as they are not done for prohibited or invidious reasons and do not rise to independent constitutional violations on their own weight."  Id. (citing Vitek v. Jones, 445 U.S. 480, 493 (1980)).  Accordingly, a prisoner cannot be transferred in retaliation for the exercise of a constitutional right.  Goff, 7 F.3d at 737 (citations omitted).  "In raising a retaliatory transfer claim, the prisoner faces a substantial burden in attempting to prove that the actual motivating factor for his transfer was the impermissible retaliation."  Id. (internal quotation omitted).  In cases involving claims of retaliatory transfer, the Eighth Circuit has consistently applied the "but for" test, which asks whether the transfer would have occurred "but for" prison officials' impermissible retaliation.  Id. (collecting cases establishing the "but for" standard).

To the extent plaintiff has alleged that his transfer was punishment for engaging in protected First Amendment activities (e.g. possession of Sovereign Citizen materials) or for reasons associated with legal work he was performing for other inmates, defendants have established non-pretextual reasons for the transfer – plaintiff and his co-defendant needed to be separated due the fact that the co-defendant had testified against plaintiff at trial, the opinion of the prosecuting AUSA, the pending investigation

---

[28]  Even if this is what "Jackson" told plaintiff, the Court has no information before it as to who had the longer sentence or who was closer to discharge -- plaintiff or his co-defendant.

into whether plaintiff was running a business, and the incident report that he was absent from the callout on December 17, 2012.  Additionally, although plaintiff has the right to free expression, this right must be balanced against prison officials' right to maintain security and prevent violence.  See Pell v. Procunier, 417 U.S. 817, 827 (1974) (The judgment of correctional officials in security matters is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.").  Defendants offered evidence, not rebutted by plaintiff, that individuals who testify against others are at increased risk of assault in the prison setting, "as a majority of inmates do not like cooperators and 'snitches.'"  Baker, Decl., ¶¶ 30, 31. Significantly, the FBI has classified "sovereign citizens" as domestic terror threats because they are anti-government extremists.  Colar, 2013 WL 141138, at *3.

Plaintiff's evidence that "Jackson" told him that his co-defendant should never had been sent to the same facility where plaintiff was housed, the inmate with the longer sentence should not transferred, and the inmate closer to discharge should transferred, not only constitutes inadmissible hearsay, but it does not establish that "but for" retaliatory reasons, plaintiff would not have been transferred.  Finally, the Court notes that the decision to place plaintiff at FCI-Sandstone rather than at another BOP prison camp was made by DSCC staff and not by any of the defendants.

For all of these reasons, the Court concludes that defendants are entitled to qualified immunity and summary judgment should be granted to defendants on plaintiff's retaliation claims.

E.     **Due Process Claims**

Plaintiff alleged that his due process rights were violated when he was forced to participate in the deposition without the witness fee, (Amended Complaint, ¶ 70); when he was disciplined for the events surrounding the deposition on December 17, 2012 (id., ¶ 72); when he was denied access to the grievance system; and when his legal work was stolen and destroyed, thus "robbing [him] of a chance to clear his name and obtain a reversal of his conviction and the $7,874,089.21 restitution order." Id., ¶ 74.  In his "supplement" to the Amended Complaint, plaintiff elaborated that defendants violated his due process rights by denying him access to an attorney in connection the deposition; by forcing him to sign a "statement of facts" without letting him read it first; by retaliating against him for not "acquiescing to [their] various demands;" by denying him the opportunity to file a petition for a writ of certiorari; by denying him access to the grievance system and by destroying evidence of their "constitutionally violative and retaliatory acts."  Supplement to Amended Complaint, pp. 2-3.

"To 'prevail on a Fourteenth Amendment due process claim, [the plaintiff] must first demonstrate that he was deprived of life, liberty or property by government action.'" Orr v. Larkins, 610 F.3d 1032, 1034 (8th Cir. 2010) (quoting Phillips v. Norris, 320 F.3d 844, 846 (8th Cir. 2003)); see also Wilkinson v. Austin, 545 U.S. 209, 221 (2003) ("The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.  A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' … or it may arise from an expectation or interest created by state laws or policies.") (citations omitted).

"This analysis as to liberty parallels the accepted due process analysis as to property." Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974).

For prisoners, a constitutionally protected interest will be found, and the protections of due process will come into play, only when a prisoner has suffered "an atypical and significant hardship in relation to the ordinary incidents of prison life so as to give rise to a constitutionally protected liberty interest."  Sanchez v. Earls, 534 Fed. Appx. 577 (8th Cir. 2013) (citing Sandin v. Conner, 515 U.S. 472, 484, (1995); Portley–El v. Brill, 288 F.3d 1063, 1065 (8th Cir.2002) (holding disciplinary segregation is not an atypical and significant hardship under Sandin); Lomholt v. Holder, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam) (holding prisoner has no constitutional right to a particular job assignment); Allen v. Purkett, 5 F.3d 1151, 1153 (8th Cir.1993) (per curiam) (holding prisoner has no constitutional right to a particular housing unit); Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir.1984) (per curiam) (holding prisoner has no property interest in contraband)).  Additionally, in Phillips, the Eighth Circuit held that a prisoner has no liberty interest in having prison officials follow prison regulations.  320 F.3d at 847. Furthermore, the due process rights of prisoners and detainees against the deprivation of their property without due process are not absolute; "they are subject to reasonable limitation or retraction in light of legitimate security concerns of the institution."  Bell v. Wolfish, 441 U.S. 520, 554 (1979).

Once a deprivation of a protected interest is established, "the next question is what process is due."  See Williams v. Norris, 277 Fed. Appx. 647, 648-49 (8th Cir. 2008) (citing Wilkinson, 545 U.S. at 224).

Plaintiff's due process claims against any of the defendants cannot proceed because he cannot establish in the first instance that he was deprived of liberty or property, or in the second instance, that he was not given all of the process he was due.

### 1. Deposition Fee

Denial of $20 does not impact plaintiff's liberty, nor does he have a constitutionally-protected protected property interest in the $20 witness fee. Plaintiff submitted no legal argument in support of this theory and the Court could locate no case that stands for that proposition. Plaintiff's claims that he was denied due process with respect to the deposition fee are meritless and should be dismissed.

### 2. Loss of Books, Legal Papers, and 83 Postage Stamps

Plaintiff has asserted a due process violation in connection with the alleged deprivation of his books and legal papers, and 83 postage stamps. Based on the evidence submitted by the defendants, there are no genuine issues of material fact regarding this claim. Henrickson explained that some of the books and materials that were taken from plaintiff did not belong to him; rather, they belonged to other inmates or to the law library, and some were deemed to be contraband. Henrickson, ¶¶ 13-19. Plaintiff admitted in his deposition that he had materials belonging to others in his possession and that he possessed Sovereign Citizen materials. Samie Decl., Ex. 10 (Spencer Dep.), p. 57-58). Defendants explained the process used to determine which books and materials plaintiff was permitted to keep, which would be sent out, and which would be confiscated. Thyen Decl., ¶¶ 9-16; Gravdal Decl., ¶¶ 8-12; Henrickson Decl., ¶¶ 13-19.

Plaintiff does not have a protected property interest in other inmates' property or in contraband. Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir. 1984) (inmate did not have a property interest in an item in his cell that belonged to a former inmate because prison rules provided that items belonging to someone else were contraband); Banks v. Rozum, Civ. No. 14-27J, 2015 WL 1186224, at *8 (W.D. Pa. March 13, 2015) ("As a matter of law . . . inmates have no legitimate property interest in contraband."). Therefore, to the extent any of plaintiff's due process claims are based on the confiscation of books constituting contraband, belonging to other inmates, other inmates' legal work or the book belonging to the law library, those claims fail.

As to the loss of his stamps, Program Statement 5880.08 directs that when an inmate transfers to another institution, the sending institution ships at government expense two boxes of personal property to the receiving institution, and personal property in excess of this limit inmate may be shipped to a non-BOP address at his or her own expense.   Thyen Decl., ¶ 9, Ex. B (Program Statement 5880.08 (Inmate Personal Property)), pp. 11-13.   Consistent with prison policy, plaintiff selected which books to send to FCP-Sandstone and which books to mail to "Joseph." Id., ¶¶ 15, 16. Thyen used the 83 stamps to mail plaintiff's excess personal property out of the facility. Id., ¶ 17.   Plaintiff did not have an unqualified interest in his stamps, such that they could not be used to mail his property to another.   On this basis, the Court finds that there was no violation of due process and Thyen is entitled to qualified immunity for the use of the 83 stamps to mail plaintiff's excess materials to "Joseph." Pryor–El v. Kelly, 892 F. Supp. 261, 271 (D.D.C. 1995) (finding no deprivation where prison officials allowed shipment of inmate's disallowed personal property to his home at his expense).

Similarly, as to the materials that were shipped out of FPC-Duluth to "Joseph" as excess property, no due process concerns were triggered when plaintiff's personal property was forwarded to an address of his choosing. Cosco v. Uphoff, 195 F.3d 1221, 1223 (10th Cir. 1999) (prisoners were not deprived of due process by the implementation of prison regulation restricting the items they could store in their cells where they were given the opportunity to mail the disputed items to their families; prisoners have no protected interest in storing property in their cells); Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991) (finding no deprivation of property where ring and postage stamps were seized by prison officials and sent to an address of inmate's choosing).

Defendants should be granted summary judgment on plaintiff's due process claims arising out of the loss of books, legal papers, and 83 postage stamps.

### 3. UDC Hearing

Defendants contended that they were entitled to qualified immunity regarding plaintiff's procedural due process claims arising out of the discipline he received as a consequence of his failure to timely appear at the callout on December 17, 2012. Defs.' Mem., p. 33. Defendants submitted that a prisoner is entitled to due process protections only when he has a cognizable liberty interest at stake. Id. (citing Board of Regents of State College v. Roth, 408 U.S. 564, 569 (1972)). A liberty interest exists when the sanction constitutes an "atypical and significant hardship." Id. (citing Sandin, 515 U.S. at 484). If a liberty interest is at stake, the inmate must receive "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institution safety and correctional goals, to call witnesses and present documentary

evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." Id., p. 34 (quoting Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 453 (1985)). Defendants submitted that plaintiff did not have a protected interest in commissary privileges or a work assignment and even if he did, he was afforded due process in the disciplinary hearing that resulted in these actions. Id.

In support of their contention, defendants submitted the following evidence: On December 19, 2012, Baker and another Correctional Counselor held the UDC hearing on Anderson's incident report. Baker Decl., ¶ 7, Ex. D. Plaintiff appeared at the hearing and had an opportunity to tell his side of the story; in this regard, he stated that he missed the callout because he did not want to do the deposition. Id. Based on plaintiff's testimony, he was found guilty of a Code 310 violation and was sanctioned to a thirty-day commissary restriction and a job change. Id. Plaintiff did not lose telephone or visiting privileges. Id. Baker denied that he sanctioned plaintiff with a job change to cover up for Anderson's previous job change. Id., ¶ 9. Baker stated that at the time of the UDC hearing, he was not aware that Anderson had already sanctioned plaintiff with a job change and had he known that, he would not have imposed the sanction. Id.

In response, plaintiff stated that during the UDC hearing Baker suggested that plaintiff "brought this upon [himself]" by threatening to file grievances. Pl.'s Facts and Evid., ¶ 46. Further, plaintiff denied and "vehemently opposed" the version of the facts put forth by Anderson and protested his innocence. Id., ¶ 48. Plaintiff contended that Baker "knowingly recorded a false confession" and falsified the UDC records to impede plaintiff's efforts to seek review of the defendants' conduct. Id., ¶ 49.

An inmate does not have protected liberty interest in commissary privileges or in his prison work assignment.  See e.g. Lomholt v. Holder, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam) (holding prisoner has no constitutional right to a particular job assignment); Freitas v. Ault, 109 F.3d 1338, 1338 (8th Cir. 1997) (loss of a prison job does not trigger a due process analysis); Jones v. Federal Bureau of Prisons, Civ. No. 09-1074, 2010 WL 3118679, at *7 (D. Minn. Feb. 8, 2010) (no liberty interest in loss of commissary privileges). Thus, as a matter of law, plaintiff cannot make out a due process claim arising out of the discipline imposed on him following the UDC hearing.

Further, the evidence before the Court establishes that plaintiff received all of the procedural safeguards required by Hill.  First, he received a copy of the incident report prior to the hearing regarding his failure to timely appear at the December 17, 2012, call out.  Baker Decl., ¶ 6, Ex. D (incident report).  Second, a disciplinary hearing was held two days later, plaintiff participated in the disciplinary hearing, and was given an opportunity to defend himself as evidenced by the fact that he "stated that he did not show up for the callout because the compound was not opened;" "he waited for staff to call him down;" and "he didn't want to do the deposition." Id., ¶ 7, Ex. D.  Third, plaintiff was provided a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.  Id., Ex. D ("Based on inmate's admission to willingly missing [sic] callout due to fact he didn't want to do deposition, greater weight of evidence.")  To rebut this evidence, all plaintiff submitted was his own testimony that the UDC records were falsified.  On a motion for summary judgment, the Court is entitled to reject fanciful and far-fetched statements that have no support beyond the plaintiff's own testimony.

Having failed to state a procedural due process claim with respect to the discipline imposed on him for failure to appear at the callout on December 17, 2012, defendants are entitled to qualified immunity on this claim. See Hager, 735 F.3d at 1013–14.

### F. Conspiracy Claims

Plaintiff alleged that defendants conspired to deprive him of his rights and retaliate against him. See Amended Complaint, ¶¶ 70-74; Pl.'s Facts and Evid., ¶¶ 53, 74. Defendants submitted that any conspiracy claims had to be dismissed as there were no constitutional violations and plaintiff's statements about an alleged conspiracy were conclusory and unsupported. Def.'s Reply, pp. 7-8. The Court agrees.

To prevail on a claim that defendants conspired to deprive him of his constitutional rights, plaintiff must show: "(1) that the defendant conspired with others to deprive him . . . of a constitutional right; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." Solomon v. Petray, 795 F.3d 777, 789 (8th Cir. 2015) (internal quotations omitted). Allegations of conspiracy must be pled with sufficient specificity and there must be factual support to suggest a 'meeting of the minds.'" Stephenson v. Deutsche Bank AG, 282 F. Supp. 2d 1032, 1070 (8th Cir. 2003) (conspiracy does not have to be pled under the heightened standard of Fed. R. Civ. P. 9, but must still be pled with factual support to suggest a meeting of the minds); Manis v. Sterling, 862 F.2d 679, 681 (8th Cir. 1988) ("Allegations of conspiracy, however, must be pled with sufficient specificity and factual support to suggest a 'meeting of the minds.'"). Conclusory allegations do not suffice. Manis, 862 F.2d at

681; see also, Williams v. Rosenblatt Sec., Inc., 136 F. Supp. 3d 593, 611 (S.D.N.Y. 2015) ("The plaintiff's allegations of a conspiracy are conclusory.  Conclusory allegations are insufficient to plead a conspiracy.").

Plaintiff's conspiracy allegations are wholly conclusory and not factually supported.  For example, plaintiff has submitted no evidence showing a "meeting of minds" among the named defendants.  More importantly, and fatal to his conspiracy theory, plaintiff has not suffered any constitutional injuries, and thus, there can be no genuine issue of material fact regarding any alleged conspiracy to deprive him of his constitutional rights.  Without an overt act that harmed plaintiff, the conspiracy claims fail.

## V.  PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 155]

Plaintiff contended that he was entitled to summary judgment on the issue of defendants' depriving him of access to the prison grievance system.  Pl.'s Resp., pp. 1, 6.  Plaintiff's Amended Complaint itemized three instances where he claimed he requested a "BP 10" form and he was denied the form and discouraged from filing a grievance.  Amended Complaint, ¶ 55.  In support, plaintiff stated that he made numerous requests for grievance forms (BP8s, BP9s and BP10s) while he was housed in FPC-Duluth and at the Douglas County Jail; between December 22, 2012 and February 21, 2013, defendants systematically denied him access to grievance forms; defendants made several threats designed to intimidate him from accessing the grievance system; Anderson never memorialized any of plaintiff's requests for grievance forms; defendants admitted that the FPC-Duluth grievance system was corrupt; BOP officer Kyla Winger visited the Douglas County Jail on February 14, 2013, and admitted

that "she was aware that Staff had received inmate requests, but those requests were being 'ignored,' 'not delivered to staff,' and that 'staff was not responding to inmates'". Pl.'s Facts and Evid., ¶¶ 73, 76, 77, 80, 82-84, 88, 89, 94, 97-99.

Defendants opposed the motion on the grounds that it was untimely pursuant to the court's order dated November 23, 2015, which granted plaintiff's request for an extension of the dispositive motion deadline to January 8, 2016. [Docket No. 135] Plaintiff's cross-motion for summary judgment was filed on February 10, 2016. Defendants' Memorandum in Opposition to Motion, p. 3 [Docket No. 159]. In addition, the motion failed on its merits because plaintiff does not have a constitutional right to access to the prison grievance system. Id., p. 4.

The defendants acknowledged that plaintiff engaged in protected activity for which he cannot be retaliated against when he files grievances. Id., p. 4, n.3. (citing Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007)). Defendants construed plaintiff's claims to mean that he was engaged in protected activities and that they had non-retaliatory reasons for their actions against him. Id. Defendants sought leave to file a supplement brief if the Court construed plaintiff's allegations to state an independent cause of action for denial of access to the administrative remedy process. Id.

As an initial matter, the Court has determined that additional briefing on plaintiff's motion was unnecessary and recommends denying the motion for the following reasons. First, as defendants point out, the motion is untimely, and plaintiff has not even attempted to explain why he did not file it by January 8, 2016. Second, any alleged failure by defendants to permit plaintiff to grieve his various complaints, is insufficient to trigger a constitutional violation. See Phillips, 320 F.3d at 847 (a prisoner

69

has no liberty interest in having prison officials follow prison regulations); <u>Prim v. State</u>, Civ. No. 15-325, 2015 WL 8779654, at *3 (D. Haw. 2015) ("Prisoners have no constitutional right to a grievance procedure, thus, they have no right to grievance forms") (citing <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988) ("There is no legitimate claim of entitlement to a grievance procedure."); <u>Ramirez v. Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003) (there is no liberty interest in processing grievance appeals because there is no entitlement to a specific grievance procedure)).  Plaintiff seems to concede this point in his motion for sanctions.  <u>See</u> Plaintiff's Motion for Sanction, p. 12 [Docket No. 163] ("Plaintiff made a Cross Motion for Summary Judgment on the issue of whether or not the Defendant's [sic] denied Plaintiff access to the Prison Grievance System.  While the issue alone may not be a constitutional issue, that is not the point. The point is, there is no material question of fact regarding this issue.").

Third, to the extent plaintiff is contending that he was disciplined or transferred because of filing grievances or seeking to file grievances, the Court has already concluded that defendants have established non-retaliatory reasons for their actions.

Fourth, assuming that plaintiff's allegations are true – that he asked for and was denied grievance forms, plaintiff has failed to articulate an actual injury that followed. Defendants attempted and failed to secure a dismissal based on plaintiff's failure to exhaust administrative remedies.  Therefore, despite not having access to the grievance system, plaintiff has been able to vigorously litigate his claims against defendants in the instant suit.  In other words, his lack of access to the grievance system has not impeded his rights vis-à-vis this lawsuit.

For all of these reasons, the Court recommends denying plaintiff's motion for summary judgment.

## VI.    PLAINTIFF'S MOTION FOR SANCTIONS [DOCKET NO. 163]

Plaintiff moved for sanctions pursuant to Rules 11 and 56(h) of the Federal Rules of Civil Procedure.   Plaintiff's Motion for Sanctions, p. 1 [Docket No. 163].   Plaintiff contended that defendants' summary judgment reply memorandum was sanctionable because it accused him of raising factual assertions not pled in the Amended Complaint, not disclosed in discovery, or which contradicted plaintiff's sworn testimony, and erroneously focused on pleading standard of Rule 9, rather than Rule 8.   Id., p. 5. Plaintiff generally argued that defendants' Reply was false and misleading and that rather than submitting any "new allegations," as defendants alleged, he was merely "fleshing out" allegations he had previously made.   Id., p. 9.   Plaintiff also complained that defendants submitted more information in their Motion for Summary Judgment than they did in their answer to the Amended Complaint, insinuating that defendants were now concocting facts to support their summary judgment.   Id., p. 6.   Plaintiff seemed to argue that an appropriate sanction would be to overlook his failure to comply with the court's scheduling order regarding the timing of the filing of his cross-motion for summary judgment.   Id., p. 12.

Defendants opposed the motion, noting that although plaintiff moved for sanctions under Rules 11 and 56(h), he failed to discuss those rules in his motion. Defendants Memorandum in Opposition to Motion for Sanctions, p. 1 [Docket No. 164]. Defendants contended that the crux of plaintiffs' argument was that they should be sanctioned for requesting in their summary judgment reply brief that the Court disregard

the 111 paragraphs that plaintiff described as "facts" in his Response, because these "facts" consisted primarily of argument, speculation, evidence contrary to sworn testimony and inadmissible hearsay.   Id., p. 2.   Defendants asserted that their arguments were colorable and were not presented for an improper purpose; therefore there was no basis for Rule 11 sanctions.   Id.

As for plaintiff's contentions regarding the difference between their Answer and their motion for summary judgment, defendants pointed out that their Answer was filed before they had conducted any discovery into plaintiff's claims and, therefore, before they obtained the information reflected in their motion for summary judgment.   Id., pp. 2-3.

The primary purpose of Rule 11 sanctions is to "deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990).   Rule 11 sanctions are "an extreme punishment for filing pleadings that frustrate judicial proceedings."   Gray v. Staley, 310 F.R.D. 32, 39 (D.D.C. 2015).   Rule 56(h) is limited to money sanctions for an affidavit or declaration filed "in bad faith" or "solely for delay."   An order to pay expenses under Rule 56(h) requires a finding of "bad faith," which courts have found only were an attorney's conduct is "egregious," such as where the affidavits "contained perjurious or blatantly false allegations or omitted facts concerning issues central to the resolution of the case."   Jaisan, Inc. v. Sullivan, 178 F.R.D. 412, 415-16 (S.D.N.Y. 1998).   Defendants' reply brief is not sanctionable.   To the contrary, it appeared to this Court that plaintiff used his motion for sanctions to submit what was essentially an unwarranted and unsolicited surreply to defendants' summary judgment motion.

Indeed, it is axiomatic that a motion for summary judgment would contain different information and more factual support than an answer to a complaint.[29]

For all of these reasons, plaintiff's motion for sanctions under Rules 11 and 56(h) is meritless and should be denied.

## VII.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion for Summary Judgment [Docket No. 140] be **GRANTED** and plaintiff's Amended Complaint be dismissed with prejudice;

2.    Plaintiff's Motion for Leave to Amend be **GRANTED** [Docket No. 154];

3.    Plaintiffs Cross-Motion for Summary Judgment be **DENIED** [Docket No. 155];

4.    Plaintiff's Motion for Sanctions be **DENIED** [Docket No. 163].


Dated:        August 1, 2016

                          *s/ Janie S. Mayeron*
                          JANIE S. MAYERON
                          United States Magistrate Judge

---

[29]    Although not raised by defendants, the Court also notes that plaintiff failed to comply with the procedural requirements of a Rule 11 sanction motion.  Before making a motion under Rule 11, the moving party must comply with the Rule's "safe harbor" provision, which requires the movant to provide notice to the parties to be sanctioned at least 21 days before filing his motion.  Fed. R. Civ. P. 11(c)(2); see also Jones v. Fed. Bureau of Prisons, Civ. No. 09-1074 (MJD/RLE), 2010 WL 3118679, at *9 (D. Minn. Feb. 8, 2010) ("The law of this District has recognized that the notice requirements, which trigger the safe harbor provisions of the Rule, are to be strictly enforced.").  There is no evidence that plaintiff complied with the procedural requirements of Rule 11 before bringing his motion.  In any event, the motion fails on its merits under both Rule 11 and Rule 56(h).

## NOTICE

**Filing Objections**:   This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.   A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).   All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date**:   This Report and Recommendation will be considered under advisement 14 days from the date of its filing.   If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.